920 A.2d 1061

Robert A. SAPERO

v.

MAYOR AND CITY COUNCIL OF BALTIMORE.

No. 72, Sept. Term, 2006.

Court of Appeals of Maryland.

April 12, 2007.

318

Alan R. Engel, Glen Burnie (Kathleen M. O'Connell, Robert Allen Sapero, Sapero & Sapero, Baltimore, on brief), for appellant.

Elva E. Tillman, Principal Counsel (George A. Nilson, City Solicitor, Sandra R. Gutman, Chief Solicitor), on brief, for appellee.

Argued before RAKER, CATHELL, HARRELL, BATTAGLIA, GREENE, and JOHN C. ELDRIDGE and ALAN M. WILNER (Retired, Specially assigned), JJ.

CATHELL, J.

We are presented in this case, yet again, with litigation stemming from the City of Baltimore's use of quick-take condemnation. Specifically, this case arises out of an attempt by the Mayor and City Council of Baltimore ("the City"), appellee, to condemn several private properties via quick-take.[1] The properties in question, owned by Robert A. Sape-

---

1. We thoroughly discussed quick-take condemnation in our recent decision in *Mayor and City Council of Baltimore v. Valsamaki,* 397 Md.

ro,[2] appellant, are located at 1701–1709 North Charles Street (commonly referred to as the "Chesapeake Restaurant") and 22–24 East Lanvale Street, both located in Baltimore City, Maryland (collectively referred to as "the Properties"). On December 8, 2005, the City filed with the Circuit Court for Baltimore City an action for regular condemnation and, within it, a petition for immediate possession of and title to the Properties. Thirteen days later, on December 21, 2005, the Circuit Court granted the City's petitions, divesting Mr. Sapero of his property by ordering that the City "be vested with possession of the fee simple interests in those properties known as 1701–1709 N. Charles Street and 22–24[E.] Lanvale Street ... as of the 21st day of DECEMBER, 2005...." Pursuant to the court's order, title to the Properties ultimately would vest in the City ten days after personal service of the petitions and relevant order upon all defendants who had an interest in the Properties, unless such interested parties filed an answer to the City's petitions within the ten day period "alleging that the City does not have the right or power to condemn title to the property...."

Mr. Sapero timely filed an answer. On January 20, 2006, the City filed an amended petition to correct typographical errors in the street directional designations. On that same date, Mr. Sapero filed a motion to vacate. On March 10, 2006, the City filed a second amended petition to include a contract purchaser of the property located at 1701–1709 N. Charles Street, Victor Cheswick, Jr. After several postponements,[3] the

---

222, 916 A.2d 324 (2007). *Valsamaki* was not available to the trial court at the time it rendered its decision in the case at bar.

2. The exact ownership of the properties, or at least of 1701–1709 North Charles Street, is somewhat in dispute. We shall discuss this more in depth, *infra*. It is, however, undisputed that appellant held record title to both properties during the time of the quick-take proceedings and continues to do so.

3. One of the postponements was requested by the City, in spite of its "immediate" need for the Properties, because a witness was unavailable.

Circuit Court finally held a hearing on March 20, 2006, where it heard arguments concerning the City's petitions and Mr. Sapero's motion to vacate. The Circuit Court granted the City's petitions and denied Mr. Sapero's motion to vacate. On March 30, 2006, Mr. Sapero filed a motion to alter or amend judgment. The Circuit Court denied that motion. This appeal followed.[4]

Mr. Sapero presents several questions for our review:

"1. Whether the Circuit Court could condemn Appellant's real property where the known contract purchase[r] was not timely made a party to the proceeding?

2. Whether the quick-take statute denies due process where the Appellant was not permitted to conduct and complete discovery?

3. Whether Appellee proved an immediate need for possession by merely testifying that it was necessary for 'business expansion?'

4. Whether Appellee acted in good faith in the condemnation proceeding by valuing Appellant's property at $770,000 when it had actual knowledge of an existing arm's length purchase contract priced at $2,000,000 for only a portion of the property?

---

**4.** Pursuant to the language of the Code of Public Local Laws of Baltimore City, § 21–16(c), the parties involved in a quick-take condemnation action in Baltimore City have the right to a direct appeal to the Court of Appeals. Section 21–16(c) states in pertinent part:

> *"The City or the Defendants or any of them shall have an immediate right of appeal to the Court of Appeals of Maryland from the decision of the trial court."* (Emphasis added.)

*See also* Maryland Rule 8–301(a) ("Appellate review by the Court of Appeals may be obtained only: (1) by direct appeal or application for leave to appeal, where allowed by law. . . ."). At oral argument before this Court, we raised an interesting tangential issue: Whether § 21–16(c) of the Code of Public Local Laws of Baltimore City was enacted before the Court of Special Appeals was granted jurisdiction over condemnation cases, and therefore, whether the right to direct appeal actually means direct appeal to this Court or to the Court of Special Appeals? Any possible jurisdictional problem was cured when this Court issued its writ of certiorari.

5. Whether Appellee can constitutionally condemn Appellant's property for economic development without proving a carefully considered or significantly controlled development plan?

6. Whether the Circuit Court could issue an order under the quick-take statute thirteen days after the filing of the petition when the statute requires the order to be entered within seven days?"

As noted, the Circuit Court entered its judgment in this case prior to our decision in *Mayor and City Council of Baltimore v. Valsamaki*, 397 Md. 222, 916 A.2d 324 (2007). Therefore, the trial court did not have the benefit of our recent decision discussing the requirement of a showing of *immediate necessity* by the City for condemnations via quick-take under the Code of Public Local Laws of Baltimore City, § 21–16. We reiterate that the City "must demonstrate the reason or reasons why it is necessary for it to have *immediate* possession and immediate title to a particular property via the exercise of a quick-take condemnation." *Valsamaki*, 397 Md. at 228, 916 A.2d at 327. As we discuss below, the factual circumstances of the case *sub judice* do not demonstrate that there was a sufficient showing by the City that immediate possession of the Properties was necessary. Therefore, quick-take condemnation was not the proper method for the City's acquisition of the Properties. We shall vacate the judgment of the Circuit Court for Baltimore City with respect to the petition for immediate possession. Additionally, we shall address Mr. Sapero's due process concerns in regard to the limited discovery allowable under quick-take condemnation pursuant to § 21–16. With our disposition of the case in addressing questions two and three, we need not resolve Mr. Sapero's other concerns.[5]

---

**5.** Though we shall not specifically resolve questions one, four, five, and six, we shall briefly comment on them.

## I. Facts

This case arises from circumstances very similar to those in *Mayor and City Council of Baltimore v. Valsamaki*, 397 Md. 222, 916 A.2d 324 (2007), *supra*, our recent decision concerning quick-take condemnation in Baltimore City. As in *Valsamaki*, we are presented with the City's attempt to obtain possession of private property in furtherance of its urban renewal efforts, specifically in the Charles North Revitalization Area. We described that plan in *Valsamaki*:

> "On October 25, 1982, the Mayor and City Council of Baltimore adopted Ordinance No. 82–799, which established the Charles North Urban Renewal Plan for the Charles North Revitalization Area.[6] Ordinance No. 82–799 sets

---

Question one presents the issue of whether a known contract purchaser must be included as a party to a condemnation proceeding in order for condemnation to take place. We note that the evidence in the record is sparse in indicating that the City had actual knowledge of a contract purchaser prior to, and at the time of, the initiation of the condemnation proceedings. The City apparently conducted title searches, the results of which, generally, would only reveal the title holder (Mr. Sapero), not any contract purchaser. Later, the City did apparently bring a contract purchaser into the action via an amended complaint.

Question four posits whether the City acted in good faith by valuing Mr. Sapero's property at $770,000 when it allegedly had actual knowledge of an existing arm's length purchase contract for $2,000,000. While there may be a legitimate question as to the good faith of the City's valuation, because of our disposition of the case, valuation is not an issue at this time. Likewise, we need not reach question five, because the City did not satisfy the basic requirement of showing immediate necessity for quick-take. For a quick-take under § 21–16, the City must first establish that prima facie showing, as well as having a carefully considered development plan.

As to question six, whether the Circuit Court's failure to comply with specific statutorily mandated time lines as to the issuance of an order, may or may not be fatal to a quick-take condemnation action. Though we shall not further discuss this question, we do note that the trial court must comply with the statutes that govern its actions, especially when a governmental entity is attempting to condemn constitutionally protected property rights.

6. "The Baltimore City Code provides that renewal projects in Baltimore City must be conducted pursuant to a renewal plan:
' § 2–5. Renewal and Conservation Plans.
*(a) Project must conform to Plan.*

forth the goals and objectives of the Charles North Urban Renewal Plan as follows:

'The basic goal of this Urban Renewal Plan is the revitalization of the Charles/North area in order to create a unique mixed-use neighborhood with enhanced viability, stability, attractiveness, and convenience for residents of the surrounding area and of the City as a whole. The objectives of this Plan include:

a. protecting existing residential neighborhoods;

No Renewal Project or Conservation Project shall be undertaken by the Department of Housing and Community Development except in accordance with the Renewal or Conservation Plan applicable to the area in which the project is to be undertaken.
*(b) Renewal Plans.*
(1) As used herein a Renewal Plan means a plan, as it exists from time to time, for the elimination, correction, or the prevention of the development or the spread of slums, blight, or deterioration in an entire Renewal Area or a portion thereof. When a plan is applicable to less than an entire Renewal Area, it shall include a description of the boundaries of the area to which it applies.
(2) The plan shall include a land use map showing the proposed use of all land within the area to which the plan is applicable, including the location, character, and extent of the proposed public and private ownership.
(3) The plan shall be sufficiently complete to define such land or property acquisition, acquisition of interests therein, demolition and removal of structures, disposition of land or property or interests therein, improvements, and programs of renovation or rehabilitation and conservation, and activities to effect substantial environmental change, as may be proposed to be undertaken or carried out in the area to which the plan is applicable; and the plan shall include a statement of the methods and standards under which the same is to be accomplished and the necessary controls to be applied in order to effect rehabilitation and conservation by owners of existing properties.
(4) The plan shall set out zoning changes, if any.
(5) The plan also shall indicate the nature of the restrictions, conditions, or covenants, if any, which are to be incorporated in deeds or contracts for the sale, lease, use or redevelopment of land or property within the area to which the plan is applicable.
(6) In addition, the plan shall state the reasons for the various provisions which it contains.'
Baltimore City Code, Art. 13, § 2–5 (2006)." *Valsamaki,* 397 Md. at 229 n. 5, 916 A.2d at 328 n. 5.

b. establishing a positive and identifiable image for the Charles/North Area compatible with the surrounding residential areas;

c. accommodating the expansion of existing retail small business;

d. promoting new retail business activity in the area;

e. establishing and enforcing uniform comprehensive design and rehabilitation standards that will enhance the physical environment of the business area through private investment;

f. bringing about a general physical improvement of the area through coordinated public improvements;

g. providing a pleasant environment for the staging of year-round promotional activities and events; and

h. removing blighting influences and creating development lots for commercial uses.'

The Property [in the case *sub judice,* 1701–1709 North Charles Street and 22–24 East Lanvale Street] is located within the boundaries of the Charles North Revitalization Area. In June 2004, the Mayor and City Council of Baltimore amended the Charles North Urban Renewal Plan by Baltimore City Ordinance No. 04–695, which specifically authorized the acquisition of the subject Property 'by purchase or by condemnation, for urban renewal purposes....' "

*Valsamaki,* 397 Md. at 230, 916 A.2d at 328.

The Charles North Urban Renewal Plan has been in existence since October 1982 and, from June 2004 onward, the City has been specifically authorized by Ordinance No. 04–695 to acquire the subject Properties. Nonetheless, as in *Valsamaki,* the City did not act on its authority for well over a year. Apparently the City attempted to negotiate the purchase of the Properties and when it could not reach an agreeable purchase price with Mr. Sapero, it moved forward with quick-take condemnation.

Had the City filed an action for regular condemnation when first authorized to do so, there would have been more than 19 months prior to the decision of the trial court during which Mr. Sapero would have had a more complete opportunity to litigate (utilizing discovery) and thus properly present defenses—which a property owner is entitled to do. Throughout a period of time that general condemnation litigation is going forward, governmental entities may continue to negotiate with property owners. The primary result of the practice in the instant case (as in *Valsamaki*)—whereby the City waits almost a year and a half, then attempts to acquire property via the quick-take procedure—is that the City effectively forecloses the ability of private property owners to fully litigate. In the absence of a true exigency, or an emergency such as an immediate need to alleviate dangerous or unhealthy conditions, the use of quick-take should always be subject to close scrutiny as to the purpose for its use. It should not be used solely as a litigation tactic. It must not be forgotten that private property rights are fundamental constitutional rights under both the Federal and State Constitutions.

On December 8, 2005, the City filed in the Circuit Court for Baltimore City a petition for condemnation and then a petition for immediate possession of and title to the Properties. The City's petition for condemnation stated that:

"It is necessary for the [City] to acquire the fee simple interest in and to the property known as 1701–1709[N.] Charles Street and 22–24[E.] Lanvale Street, in Baltimore City, State of Maryland ... together with improvements thereupon, and all the rights, ways, waters, easements, privileges, advantages and appurtenances thereto belonging or in anywise appertaining."

The petition for condemnation further provided that "[t]his property will be used for redevelopment purposes; namely in the North Charles Project area."

The City's subsequent petition for immediate possession and title stated: "That it is necessary for Petitioner to acquire immediate possession and title to the said property interests

as appears from the affidavit of William N. Burgee, Director of Property Acquisition and Relocation, Department of Housing and Community Development, attached hereto and prayed to be taken as a part hereof." The attached affidavit of William N. Burgee stated, in relevant part, only that "[t]hese properties . . . must be in possession of the Mayor and City Council of Baltimore at the earliest possible time in order to assist in a business expansion in the area." Again, as in *Valsamaki*, there was no attempt in the affidavit to specify the immediacy of the necessity other than the general statement that the Properties were needed "*at the earliest possible time in order to assist in a business expansion in the area.*" [Emphasis added]. The City, in the affidavit, provided no reason "why" any such business expansion necessitated the *immediate* acquisition of the Properties.

After the Circuit Court granted the City's petitions on December 21, 2005, Mr. Sapero timely filed an answer in which he, among asserting other defenses, (1) denied that the City had the right or power to condemn the title to, and take possession of, the Properties and (2) attacked the constitutionality of the City's petition for condemnation. On February 24, 2006, Mr. Sapero served discovery on the City consisting of interrogatories, a request for production of documents, and a request for admissions.[7] Thereafter, on March 10, 2006, the City filed an amended petition, adding Victor Cheswick, Jr., contract purchaser for 1701–1709 North Charles Street, as an additional defendant.

After several postponements, at least one of which was requested by the City, and more than three months after the City filed its quick-take petition, and almost two years after it had authority to condemn the Properties, a quick-take hearing[8] was held on March 20, 2006, in the Circuit Court for

---

7.   As far as the Court has been informed, the City has never answered interrogatories, provided documents, or made (or rejected) the requested admissions.

8.   A hearing in respect to valuation normally is held at a later time, during which a property owner may choose to have a jury determine

Baltimore City. This was 20–21 months after the City could have initiated condemnation but only three months and several days after it actually did. The trial court first addressed Mr. Sapero's request for a continuance based upon the fact that the contract purchaser (Mr. Cheswick)—a named party from the second amended complaint—was not present at the hearing. After hearing arguments from the parties' respective counsel, the trial court, that had granted a continuance to the City on the basis that one of its witnesses was not available, found that a continuance was not necessary in respect to the property owner's request and also denied Mr. Sapero's oral motion to vacate. Specifically, the trial court stated:

> "The court does not believe it's appropriate to continue this proceeding, or to vacate that order simply because of the addition of Victor Cheswick to these proceedings that occurred sometime last week.
>
> . . .
>
> "That is this issue of the timing of these proceedings is a delicate one. Now, clearly Mr. Sapero as the legal owner of the property, there is no dispute as to that. He has filed this motion, he asked this court for a hearing. That has been addressed, and quite frankly, there has been more than ample time to address the procedural and substantive issues that are subject to this court's review.
>
> "So for those reasons, the court is going to deny the motion for continuance at this time, deny the oral motion to vacate the court's order of December 21, 2005, and go forward with a hearing on both the procedural and substantive issues raised in the motion to vacate, as well as any other proceedings that counsel wish this court to entertain."

After further argument by the parties as to how the hearing should proceed, the trial court stated:

---

valuation. In regular condemnation actions, the property owner could also continue to challenge the "public use" aspect of the proposed condemnation during that period through the use of discovery, expert witnesses, factual witnesses, cross-examination, and the like.

"Before the court is a preliminary matter that defendant's counsel raises with regard to the scope of this proceeding today.

"It is argued by the defendant that the court should not go forward with a hearing on the fundamental issue of the due process and constitutional challenges to the city's authority to take by quick take the property of the defendant.

*"It is argued that the defendant should have the opportunity to conduct reasonable discovery on the critical issues that are raised in this proceeding.*

"The city maintains that the defendants have had more than ample time, more time than typically afforded under the critical statute, Section 21–16C of the Code of Public Local Laws of Baltimore City. The city further argues that the whole purpose in a quick take proceeding is to provide title [to] the condemning authority so that it can go forward with a project.

"The court must start and end the analysis with Section 21–16C, which according to the defendant's argument, the court should not apply the time frame, because they are discretionary and not mandatory.

. . .

*"While I am empathetic to the reasonable concerns voiced by the defendant in terms of the time frame, that time frame is mandatory as established by the Code of Public Local Laws under Section 21–16.* It provides [that] the court shall, not should, [ ] schedule a hearing within 15 days of the filing of an answer, which hearing shall be only for the purpose of contesting the right and power of the city to condemn the title to the property.

"That in this court's view is controlling, and therefore in light of the fact that in this case an answer and motion to vacate was filed on January 5 and an appropriate response in opposition was filed on February 15, we sit here today on March 20th really more than two months after the motion to vacate and the answer was filed by the defendant.

"That is significantly more time than even allowed by 21–16. *So because of the plain meaning of 21–16, which I do understand and will say it's very constricting in terms of time,* the court must apply the time frame under that section of the Code of Public Local Laws.

"So at this point, the court will go forward with the hearing on the defendant's motion to vacate, and as well on the issue of the constitutional issue as to the propriety of the taking itself." [Emphasis added.]

The trial court then denied Mr. Sapero's motion to vacate, stating:

"In short, [although] it does seem in part unfair that the time frame is so stringent and so rigorous. I do not find on the arguments presented that that time frame established by the Code of Public Law is unconstitutional.

. . .

"Nevertheless, there is this substantive issue included in the motion to vacate. The court will address by way of a hearing in the context of whether or not the city can demonstrate that the public interest requires that the city have immediate possession of the property.

"So for those reasons, the court will deny the motion to vacate, and I'll pass the written order this evening reflecting denial of the motion on procedural grounds only, not on the substantive issue created in the third argument." [Emphasis added.] [9]

The City called two witnesses in support of its arguments: Mr. Paul Dombrowski (the Director of Planning and Design for the Baltimore Development Corporation and also the

---

9. The portions of the trial court's rulings we have emphasized above clearly indicate that it fully understood the extreme restrictions Baltimore City's practices placed on a property owner's ability to utilize discovery in the process of presenting a defense, and that it had serious concerns in respect to the fairness of the practice. It felt, however, in the pre-*Valsamaki* era, that it had no choice but to rule as it did. In other words, it recognized the issue, but at that time felt it lacked the power to correct the problem.

Project Manager for the Charles North area) and M.J. "Jay" Brodie (President of the Baltimore Development Corporation). The City first questioned Mr. Dombrowski in regard to the amount tendered by the City for the property known as the Chesapeake Restaurant. Mr. Dombrowski only testified on the subject of valuation—he provided no testimony as to the existence of any exigency or emergency, or any other reason why the acquisition of the Properties was immediately necessary. The City next called Mr. Brodie. Mr. Sapero initially objected, asking that a continuing objection be placed in the record due to the lack of discovery in the proceedings and his resulting inability to depose Mr. Brodie prior to the hearing. The trial court overruled his objection, but acquiesced in his request that it be continuing.

On direct examination, the City asked Mr. Brodie whether it was necessary to enact Ordinance No. 82–799 and Ordinance No. 04–695 in the Charles North area. Specifically, the question was phrased, " . . . was it necessary to enact an urban renewal ordinance in this geographic area?" After an objection was made by Mr. Sapero, and overruled, Mr. Brodie responded:

"Well, the basic reasons are the area has had some structures that were vacant for many years. The Chesapeake is a case in point. That is they were not contributing to business activities.

"In some cases, but not all, the buildings were not maintained well. There have been empty buildings for a long time, some are deteriorated, the buildings . . . .

"The northwest corner of North and Charles might be indicative of some of the deteriorating conditions. So it is a mixed bag of buildings, some maintained better on the outside than others.

"We do in this area, in the Charles North area as we always do, have considered in consultation with residence groups and community associations . . . .

. . .

"... So in our view as the Baltimore Development Corporation, we proposed to the City Council amendment five [Ordinance No. 04–695] in the last several years, which would call for the city's acquisition of certain properties so that they could be assembled, and go back to the area I quoted, number H [*see* Ordinance No. 82–799A.2.h, *supra,*] creating development lots for commercial uses. That was part of our intention."

The City then asked Mr. Brodie: "[W]hy is the subject property at 1701–9 North Charles Street necessary for the urban renewal of the subject area?" After the trial court overruled another objection by Mr. Sapero, Mr. Brodie responded:

"Well, I quoted from the ordinance so as not to be spontaneous about it. The assemblage of properties for new commercial uses, particularly the Chesapeake Restaurant, the parking lot behind it, which is not owned by Mr. Sapero, but by others, and that we as part of the plan approved by the Planning Commission and the City Council.

"It was one of several properties, you see them here, a series of properties behind the Chesapeake and its groupings on the southwest corner of the intersection of North and Charles, and the northeast corner. The proposal in the plan was for the city to acquire those properties, to run a competitive process to select a developer to either renovate or a combination of renovate and new construction."

After describing the process which the City goes through when soliciting developers for projects such as the Charles North area, the City asked Mr. Brodie whether any developers had been selected for this particular project. Again, Mr. Sapero's objection was overruled, and Mr. Brodie responded: "The city received three proposals." Further response was stricken from the record upon the sustaining of Mr. Sapero's additional objection.[10] The City then concluded its question-

---

10. The relevant colloquy occurred as follows:

ing of Mr. Brodie. Mr. Sapero declined to cross-examine Mr. Brodie due to his inability to conduct discovery. At no point in the questioning did Mr. Brodie testify to the existence of any exigency or emergency or otherwise state why it was necessary for the City to obtain *immediate* possession of the Properties.

On March 30, 2006, Mr. Sapero filed a motion to alter or amend judgment. On May 2, 2006, the Circuit Court denied that motion. Thereafter, Mr. Sapero noted a direct appeal to this Court.

## II. Standard of Review

This case was tried in the Circuit Court without a jury; therefore, we review it on both the law and the evidence. Md. Rule 8–131(c); *Banks v. Pusey,* 393 Md. 688, 697, 904 A.2d 448, 453 (2006). We will not set aside the judgment of the trial court on the evidence unless "clearly erroneous," and in our review "will give due regard to the opportunity of the trial

---

"[City's Counsel]: Were any developers selected for this project?
[Mr. Sapero's Counsel]: Objection.
Judge: Overruled. You may answer.
Mr. Brodie: The city received three proposals. As a point of fact, we wrote Mr. Sapero so that there would be no question that we were performing the request for proposal process so that if he chose, would have the opportunity to submit a proposal. He didn't do so.
[Mr. Sapero's Counsel]: Objection, move to strike. Beyond the scope.
Judge: And I'll grant the motion. I'm going to sustain it. The city received three proposals.
Mr. Brodie: The city received three proposals.
[City's Counsel]: Yes.
Mr. Brodie: I just was making the point that one of those proposals was not from Mr. Sapero. The city convened an advisory panel, considered the three proposals, selected—
[Mr. Sapero's Counsel]: Objection—
Judge: I'm going to sustain the objection. [City's Counsel], you can certainly follow up on that if you chose.
[City's Counsel]: Thank you. Court's indulgence, please.
Judge: Yes, sir.
[City's Counsel]: That's it, Your Honor."
The City did not elicit any further testimony from Mr. Brodie, thus, the only admissible evidence from this portion of the direct examination was that the City had "received three proposals."

court to judge the credibility of the witnesses." Md. Rule 8–131(c); *Banks,* 393 Md. at 697, 904 A.2d at 453. The trial court's conclusions of law, however, are not entitled to such deference. "When the trial court's order 'involves an interpretation and application of Maryland statutory and case law, our Court must determine whether the lower court's conclusions are legally correct under a *de novo* standard of review.' " *Nesbit v. GEICO,* 382 Md. 65, 72, 854 A.2d 879, 883 (2004) (quoting *Walter v. Gunter,* 367 Md. 386, 392, 788 A.2d 609, 612 (2002)).

### III.  Discussion

We shall address the issues in reverse order, first turning to Mr. Sapero's contention that the City did not provide sufficient evidence of immediate necessity for quick-take condemnation.  Then, we shall address Mr. Sapero's due process concerns.

### A.  Immediate Necessity—Quick–Take

The Code of Public Local Laws of Baltimore City, § 21–16, is titled " 'Quick-take' condemnation—in general," and states in subsection (a), titled "Petition for Immediate Taking," that:

> "Whenever any proceedings are instituted under Title 12 of the Real Property Article of Public General Laws of the State of Maryland or by the Mayor and City Council of Baltimore for the acquisition of any property for any public purpose whatsoever, the Mayor and City Council of Baltimore, simultaneously with the filing of said proceedings or at any time thereafter, may file a Petition under oath *stating that it is necessary* for the City to have *immediate* possession of, or *immediate* title to and possession of, said property, *and the reasons therefore.*"

§ 21–16(a) (emphasis added).  Section 21–16(c) requires that the City, in a petition for immediate possession of and title to property, state under oath the reasons why it is necessary for the City to have immediate possession of the property.  A property owner is entitled to challenge the validity and sufficiency of those reasons or the requirement would be no

requirement at all. Moreover, the statute places the issue before the courts. If the trial court is satisfied that there is an immediate need, it may then grant immediate possession if it feels it is required in the public's interest: "*If it appears from a Petition for Immediate Possession,* with or without supporting affidavits or sworn testimony, that the public interest requires the City to have *immediate* possession of said property...." § 21–16(d) (emphasis added). In *Valsamaki,* we distinguished such quick-take condemnation actions from regular condemnation actions:

> "In the case of regular condemnation, once the City establishes at least a minimal level of public use or purpose, judicial review may be thereafter limited to determining that the agency's decision is not so oppressive, arbitrary or unreasonable as to suggest bad faith; that, however, is not the case in assessing immediacy in a quick-take condemnation action in Baltimore City under § 21–16. Rather, the court must also determine whether there is a necessity to justify an *immediate* taking and, in that determination, must be able to assess the reasons for the immediacy. Section 21–16 expressly *requires the City* to state reasons relating to immediacy, thus the City has the burden not only to present a *prima facie* case of public use, but, additionally, in a quick-take action, the burden to establish the necessity for an immediate taking."

*Valsamaki,* 397 Md. at 254, 916 A.2d at 343.

Concerning the immediate necessity for quick-take condemnation, Mr. Sapero asserts that § 21–16 "specifically require[s] that some justifiable, readily apparent and irrefutable evidence [must] exist that a taking is necessary, not just a bald assertion that a necessary reason exists." And furthermore, that "[t]he quick-take law's plain language initially places the burden of proof upon the Petitioner requesting immediate possession, that is, [the City], to provide *reasons* for the necessity for immediate possession, not just some general assertions that a reason exists." We agree with the gist of

Mr. Sapero's contentions. They are in accord with our decision in *Valsamaki*, 397 Md. 222, 916 A.2d 324.

The City, however, while acknowledging that it has the burden to prove immediate necessity in order to proceed with quick-take condemnation, argues that the case *sub judice* is distinguishable from *Valsamaki*. Specifically, the City states:

> "In the *Valsamaki* case the court found that the City had not demonstrated the reason or reason(s) why it was necessary for it to have immediate possession and immediate title to a particular property via the exercise of quick take condemnation.

> "In this case not only did the City provide an affidavit stating the need for the property as 'business expansion', but both Mr. Paul Dombrowski, Planner and Mr. M. Jay Brodie, President of Baltimore Development Corporation ('BDC') testified at the hearing before Judge Berger on March 20, 2006."

We do not find the City's arguments to be persuasive.

The affidavit in the case *sub judice* stated only that the Properties "must be in possession of the Mayor and City Council of Baltimore at the earliest possible time *in order to assist in a business expansion in the area.*" [Emphasis added]. That language is *identical* to the affidavit language in *Valsamaki*, which we found to be inadequate in demonstrating necessity for an immediate taking. 397 Md. at 231, 916 A.2d at 329. Discussing the relevant petitions in *Valsamaki*, which, we reiterate—with the exception of the property addresses— utilized language virtually identical to the petitions in the case *sub judice*, we stated:

> "Section 21–16(a) specifically provides that the City must show the necessity for an *immediate* taking. The City's petitions evince a dearth of any specific evidence showing a necessity for the immediate possession of the Property via quick-take condemnation as opposed to a regular condemnation. In the petition for condemnation, the City simply stated that: 'This property will be used for redevelopment

purposes; namely in the Charles North Project area.' [11] The petition for immediate possession and title referenced an attached affidavit which provided only a conclusory and general statement that: 'The property ... must be in possession of the [City] at the earliest time possible *in order to assist in a business expansion in the area.*' [Emphasis added]. . . .

"The record does not demonstrate sufficient evidence to support a finding that the City is entitled to *immediate* possession of the Property. As stated *supra*, the affidavit attached to the petition for immediate possession and title only provides that immediate possession is necessary 'in order to assist in a business expansion in the area.' This statement, in and of itself, while perhaps sufficient to justify regular condemnation, does not justify a quick-take condemnation. *Cf. Free State*,[12] *supra* (where affidavit showed necessity for public safety)."

*Valsamaki*, 397 Md. at 256, 916 A.2d at 344.

The City stresses that the testimony of Mr. Dombrowski and Mr. Brodie, *supra*, provides further indication of the necessity for the immediate acquisition of the Properties. In particular, the City points out that, unlike the situation in *Valsamaki*, in the case *sub judice*, Mr. Brodie testified that three proposals for the redevelopment of the Properties had already been received by the City. As indicated *supra*, however, Mr. Dombrowski did not testify at all as to the necessity for the City's immediate possession of the Properties. And Mr. Brodie did not testify to anything other than what Ordinance No. 82–799 and Ordinance No. 04–695 outlined, "[w]ell, I quoted from the ordinance so as not to be spontaneous about

---

**11.** It appears that the City made a typographical error in its petition for condemnation (and the amended versions) in the instant case. Those petitions stated that: "This property will be used for redevelopment purposes; namely in the North Charles Project area." We assume that the City intended to refer to the "Charles North Project area."

**12.** *Free State Realty Co., Inc. v. City of Baltimore*, 279 Md. 550, 369 A.2d 1030 (1977).

it[,]" and to the fact that three proposals had been received, "[t]he city received three proposals." As stated *supra,* further response was stricken from the record upon the sustaining of Mr. Sapero's additional objection. The admitted testimony is insufficient to show the reason or reasons why it is necessary for the City to have immediate possession of the Properties in the case *sub judice.*

▮ The City argues that Mr. Sapero's objections kept "specific information about the RFP [Requests for Proposals] and the plan the City contemplated out of the record" [13] and that Mr. Sapero, by declining to cross-examine Mr. Brodie, curtailed evidence that Mr. Brodie would have given in support of the necessity for the immediate taking. The City states that "[i]t is specious of [Mr. Sapero] to assert now that there was no immediate necessity for the City's taking." We do not believe that his argument is specious. The City has the burden under § 21–16 to show the necessity for the immediate possession of property via quick-take condemnation. There is a reason for this. Quick-take condemnation results in a deprivation of the constitutionally protected right to property without the more complete due process protections available in a regular condemnation action.

---

**13.** In a response to Mr. Sapero's Motion to Establish Hearing Date and Procedures, filed by the City on March 10, 2006, (just 10 days before the hearing) the City stated in that response, unsupported by an affidavit, that:

"The nature of a quick-take proceeding is that the condemning authority is in need of the property at the earliest possible time in order to assemble the required development 'footprint'. The City has already awarded this project to a developer, but the developer will not sign an Exclusive Negotiating Privilege [whatever that is], and the plan cannot proceed, until the issue of title has been resolved."

These alleged facts were never admitted into evidence. Moreover, this statement, especially given the extended period during which regular condemnation could have occurred, would not in any event, in and of itself, sufficiently support the immediate necessity required by § 21–16(d) to be shown in the "Petition for Immediate Possession." Additionally, because this was a quick-take, Mr. Sapero did not have the opportunity to take the deposition of any potential witnesses, including the unidentified developer and Mr. Brodie, or conduct any other discovery.

In the case of such limited proceedings, it is the City's responsibility to provide evidence of the actual exigency or emergency for such an immediate taking. The City is arguing that its inability to effectively elicit testimony from its own witnesses—testimony necessary to support its case—justifies a finding of immediate necessity. This argument is unavailing. It is the responsibility of a particular party to establish evidence in support of its own argument. The City failed to do that here. The fact that Mr. Sapero objected to questions posed by the City and to the testimony of the City's witnesses and that such objections were sustained, is part and parcel of litigation. Moreover, because of the time constraints of quick-take actions, discovery was effectively curtailed for Mr. Sapero. His objections were based on the fact that the type of process chosen by the City deprived him of an opportunity to fully litigate the issues upon which the City's witnesses were about to testify. The City's choice of procedures created the problem, not Mr. Sapero's objections. Furthermore, there is no requirement that a party must cross-examine a witness. It was Mr. Sapero's right to decline to question the witnesses, especially in light of the effective denial of discovery caused by the City's choice of action.

The City, citing to *Johnson v. Consolidated Gas, Elec. Light & Power Co.*, 187 Md. 454, 462–63, 50 A.2d 918, 922–23 (1947), also argues that "[t]he necessity for the taking does not have to be absolute; all that is required is that it be reasonable under the circumstances." Specifically, the City states that *Johnson* holds that "[u]nless the discretion of the condemning agency as to reasonable necessity is wrongfully, arbitrarily, or oppressively exercised, that discretion cannot be controlled or reviewed by the Court." 187 Md. at 463, 50 A.2d at 923 (citing *Beall v. Redmiles*, 176 Md. 677, 681, 6 A.2d 551, 553 (1939)). These arguments in relation to *Johnson*, however, are inapposite to the case at hand. The Court in *Johnson* addressed an instance of regular condemnation for the right-of-way for electric light and power lines, as well as transmission towers, across a piece of private property in Baltimore County. 187

Md. at 457, 50 A.2d at 919. The case did not involve quick-take condemnation in Baltimore City under § 21–16, which requires a prima facie showing of immediate necessity significantly different than that referred to in *Johnson*. Under a regular condemnation action, reasonable necessity for the condemnation itself may (or may not) be sufficient, but § 21–16 specifically requires for quick-take condemnation that the City demonstrate the reason or reasons why it is necessary for the City to have *immediate* possession of and immediate title to property. The necessity for immediacy relates to the actual existence of an exigency or emergency and such necessity for *immediate* possession in quick-take actions is different and more demanding than the necessity for condemnation in general.

Two instances in which we have found such necessity for immediate possession occurred in *Free State Realty Co., Inc. v. City of Baltimore*, 279 Md. 550, 369 A.2d 1030 (1977) and *Segall v. City of Baltimore*, 273 Md. 647, 331 A.2d 298 (1975) (per curiam).[14] In both cases, the affidavits presented evidence showing the alleged necessity for the City's immediate possession of the properties in question. In *Free State*, the Court addressed whether a severely deteriorated building could be condemned via quick-take. The affidavit attached to the petition for immediate possession stated that:

"[T]he dwelling ... 'ha[d] deteriorated to such extent *as to constitute a serious and growing menace to the public health, safety and welfare,*' which was 'likely to continue to deteriorate unless corrected, and [that] such continued deterioration m[ight] contribute to the blighting or deterioration of the immediately surrounding area thereto.' It further recited that the owner had 'failed to correct the deterioration thereof as evidenced by the violation notice[s] attached....'"

279 Md. at 552, 369 A.2d at 1031 (emphasis added). The Court found that, based upon the evidence in the affidavit, the

---

14. This was a one paragraph opinion that, though it found the City's "hold-out" reasons sufficient, did not fully examine the process.

property constituted an immediate serious and growing menace to public health, safety, and welfare. *Id.* There is no finding in the case *sub judice,* nor facts presented, of a serious and growing menace to public health, safety, and welfare.

In *Segall,* the Court found that the affidavit showed that all of the other properties in the development area had been acquired and that the sale of the entire site could not be completed until that last property had been acquired, i.e., a "hold-out" situation may have existed.[15]  273 Md. at 648, 331 A.2d at 298–99.  Specifically, the one paragraph opinion of the *Segall* Court stated, in relevant part, that:

"The basis of the[ ] claim is the requirement of Code of Public Local Laws of Baltimore City (1969) § 21–16(a) as amended by Chapter 420, Acts of 1972, that a petition for immediate possession state 'the reasons therefor.'  [The appellants] say the City failed to comply.  The short answer to this contention is that the City's petition referred to an attached affidavit.  That affidavit said '[t]hat all other property interests in the ten disposition lot areas aforesaid ha[d] been acquired, and demolition and sale of the entire site areas [could] not be completed until possession and title of the subject property interest [were] granted to the City.'  This complied with the statute.  For this reason we have not addressed ourselves to the City's motion to dismiss the appeal."

*Segall,* 273 Md. at 648, 331 A.2d at 298–99.

Unlike *Free State* and *Segall,* the instant case does not present the Court with sufficient evidence to justify quick-take

---

**15.**  In *Valsamaki,* we described the "hold-out" situation:

"During property assemblages, whether private or public, one or more property owners resist selling, wanting to be the last owner of a parcel or among the last, in order to be able to demand higher prices for their property because they are holding up a large project.  In private acquisitions a purchaser's options in dealing with hold-outs are limited.  In public acquisitions, the condemnation process—even quick-take actions—are available to address the situation."

397 Md. at 257 n. 18, 916 A.2d at 345 n. 18.

condemnation under § 21–16. The affidavit only stated that the Properties were needed "at the earliest possible time in order to assist in a business expansion in the area," which, we deem to be an insufficient indication of necessity for immediate possession. *See Valsamaki, supra.* Furthermore, although Mr. Brodie testified that three proposals had been received for the redevelopment of the Properties (or at least the Chesapeake Restaurant property), there was no specific evidence, *or any evidence,* admitted by affidavit or otherwise, of a need for the use of quick-take or even a specific plan for the Properties introduced beyond that basic statement.[16] There certainly was no evidence presented that quick-take was necessary for the public's health, safety, or immediate welfare, and it was not asserted by admitted evidence that Mr. Sapero was a "hold-out" of any sort. In fact, the City had the power to initiate condemnation for approximately a year and a half and chose to wait, apparently until the last minute, and then decided to make use of a type of action that curtailed the property owner's ability to present a defense. Based upon this lack of evidence for the necessity of the City's immediate, i.e., quick-take possession of the Properties, especially in light of our recent holding in *Valsamaki,* we hold that the Circuit Court erred in granting the City's petition for the immediate taking.[17]

We now turn to address the due process concerns which arise from quick-take condemnation under § 21–16.

---

16. There are some copies of architectural renderings present in the record, but there was not any discussion at the hearing of any specific, particularized plan for the redevelopment of the Properties beyond that evident from Ordinance No. 82–799.

17. Our decision relates to the petition for immediate possession filed in the present case. The petition for regular condemnation remains in place. The City may proceed under it, affording to appellant the discovery to which he is entitled. If, at a future point in time, the City believes it can properly establish a need for an immediate taking, it may file another petition for immediate taking—so long as appellant has a sufficient opportunity to conduct discovery. Even in truly exigent or emergency situations (which the present case is not), great efforts should be made to allow a property owner to fully conduct a defense prior to the loss of possession and title.

## IV. Due Process

"The right to private property, and the protection of that right, is a bedrock principle of our constitutional republic." *Valsamaki,* 397 Md. at 241, 916 A.2d at 335. That right to private property is a fundamental right provided by both the Federal Bill of Rights and the Maryland Declaration of Rights and cannot be taken without due process of law. The Fifth Amendment of the United States Constitution provides that, "No person shall be ... deprived of life, liberty, or *property, without due process of law;* nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V (emphasis added). The Fifth Amendment is made applicable to the States by the Fourteenth Amendment, which provides that, "nor shall any State deprive any person of life, liberty, or *property, without due process of law....* " U.S. Const. amend. XIV (emphasis added); *Chicago, B. & Q.R. Co. v. Chicago,* 166 U.S. 226, 239, 17 S.Ct. 581, 585, 41 L.Ed. 979 (1897); *King v. State Roads Comm'n,* 298 Md. 80, 83, 467 A.2d 1032, 1033–34 (1983). The importance and security of private property rights has been extant since the earliest days of the development of this country and is of no less importance today. *Kelo v. City of New London, Connecticut,* 545 U.S. 469, 497–98, 125 S.Ct. 2655, 2673, 162 L.Ed.2d 439 (2005) (O'Connor, J., dissenting); *Wilkinson v. Leland,* 2 Pet. 627, 657, 7 L.Ed. 542 (1829); *Calder v. Bull,* 3 Dall. 386, 388–89, 1 L.Ed. 648 (1798); *Valsamaki,* 397 Md. at 240–42, 916 A.2d at 335–36; 1 *Records of the Federal Convention of 1787,* p. 302 (M. Farrand ed.1934) (Alexander Hamilton described "the security of Property" as one of the "great obj[ects] of Gov[ernment].").

Maryland's Constitution provides, in Article 24 of the Declaration of Rights: "That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or *property,* but by the judgment of

his peers, or *by the Law of the land.*" Md. Const. Declaration of Rights art. 24 (emphasis added). The term "Law of the land," derived from the Magna Carta, is generally considered to be synonymous with the term "due process of the law" as used in the Fifth and Fourteenth Amendments to the federal Constitution. *In re Katherine C.,* 390 Md. 554, 572 n. 21, 890 A.2d 295, 305 n. 21 (2006); *Crawford v. State,* 285 Md. 431, 451 n. 3, 404 A.2d 244, 254 n. 3 (1979); *Horace Mann League v. Board,* 242 Md. 645, 685, 220 A.2d 51, 73 (1966); *Oursler v. Tawes,* 178 Md. 471, 483, 13 A.2d 763, 768 (1940); *Baltimore Belt R. Co. v. Baltzell,* 75 Md. 94, 99, 23 A. 74 (1891) (" 'The law of the land' and 'due process of law' as here used, it can hardly be necessary to say, mean the same thing."); *Wright v. Wright's Lessee,* 2 Md. 429, 452 (1852). *See also* Article III, section 40 of the Maryland Constitution.

Section 21–16(c) of the Code of Public Local Laws of Baltimore City outlines the procedural process for quick-take condemnation actions in Baltimore City. Titled *"Vesting of title and possession,"* it states that:

"In cases where the City files a Petition for Immediate Taking of title and possession to the said property in fee simple absolute or such lesser estate or interest as is specified in the Petition, title thereto shall irrevocably vest in the Mayor and City Council of Baltimore ten days after personal service of the Petition upon each and every Defendant or, if the Defendants or any of them shall file an answer to the Petition within the said ten day period alleging that the City does not have the right or power to condemn title to the property, then on the date of the trial court's decision or on the date of decision in any appeal from the trial court.

"In the event the Defendants or any of them should file an answer, the court shall schedule a hearing within fifteen days of the date of the filing of an answer, which hearing shall be only for the purpose of contesting the right or power of the City to condemn title to the property. The trial court shall render its decision within fifteen days from the final day of said hearing. The City or the Defendants

or any of them shall have an immediate right of appeal to the Court of Appeals of Maryland from the decision of the trial court.

"Possession shall vest in the Mayor and City Council of Baltimore simultaneously with the vesting of title, except when the City has taken possession previously under subsection (d) of this section."

§ 21–16(c). As we stated in *Valsamaki*, the procedural timing of the quick-take process under § 21–16(c) severely limits a party's ability to obtain any discovery prior to a taking:

"Section 21–16(c) of the Public Local Laws of Baltimore City provides that an individual has ten days after being served with a petition for immediate taking of possession and title to property to file an answer challenging the City's right or power to condemn. In that event, the court must schedule a hearing within fifteen days of the date of the filing of the answer. Therefore, a hearing would take place within 25 days of an individual being served with a petition. Pursuant to Maryland Rule 2–421 ('Interrogatories to parties') and Rule 2–422 ('Discovery of documents and property'), a party has 30 days to respond upon being served with a discovery request for interrogatories or documents. Additionally, Rule 2–417 ('Deposition—Written questions') provides that a party has 30 days from receipt of service of the notice to serve their own cross questions. So, not only is the time to prepare for trial drastically shortened in a quick-take action, but discovery in the ordinary course of litigation is virtually impossible. Important procedural due process protections are conspicuously absent from this stage of the proceeding in quick-take actions."

*Valsamaki*, 397 Md. at 232 n. 8, 916 A.2d at 329 n. 8.

In the case *sub judice*, Mr. Sapero attempted to accomplish discovery by serving interrogatories, a request for production of documents, and a request for admissions on the City. The City did not respond to any of these attempts at discovery, nor

did it have to under the strictures of § 21–16. Herein lies the problem. The timing under which quick-take condemnation takes place pursuant to § 21–16(c) severely and prohibitively restricts a party's ability to prepare for the hearing to challenge the quick-take condemnation.

Procedural due process protections dictate that, at a minimum, the deprivation of property by adjudication requires that a party receive notice and a reasonable opportunity to be heard consistent with the circumstances of the taking. *Hamdi v. Rumsfeld,* 542 U.S. 507, 533, 124 S.Ct. 2633, 2648, 159 L.Ed.2d 578 (2004); *LaChance v. Erickson,* 522 U.S. 262, 266, 118 S.Ct. 753, 756, 139 L.Ed.2d 695 (1998) ("The core of due process is the right to notice and a meaningful opportunity to be heard."); *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985) ("An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.' ") (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950)); *Canaj, Inc. v. Baker and Division Phase III,* 391 Md. 374, 424, 893 A.2d 1067, 1097 (2006). The opportunity to be heard is the fundamental requisite of due process of law. *Mullane,* 339 U.S. at 314, 70 S.Ct. at 657; *Grannis v. Ordean,* 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914); *Canaj,* 391 Md. at 424, 893 A.2d at 1097. In the case *sub judice* there is no issue presented as to whether notice was made; notice, such as required under the statute, was given to Mr. Sapero. He received notice of the City's petitions, filed an answer, and a hearing was held. The issue that raises the Court's primary concerns, and what we shall now address, relates to Mr. Sapero's opportunity to be heard, i.e., whether such hearings in § 21–16 quick-take actions are meaningful, reasonable, and appropriate to the nature of the case.

Hearings in the context of § 21–16 quick-take condemnation actions, as they are conducted in Baltimore City, are apparently truncated proceedings, in which the property owner,

whose property rights are at issue, does not have sufficient access to general discovery in aid of litigation. The inability of the property owner to obtain discovery is apparently known to the City. As far as we can determine from the records, this is the second case in recent months before this Court where the City has acquired property, or attempted to acquire it, without ever responding in either case to any discovery requests.[18] This process differs from regular condemnation proceedings, wherein the party subject to the condemnation proceedings has full access to general discovery as provided by the Maryland Rules. *See* Md. Rule 12–206(a) ("Except as otherwise provided in this Rule, discovery in actions for condemnation shall be conducted pursuant to Chapter 400 of Title 2 of these Rules.").

These quick-take condemnations deal with the fundamental right to property, and any resulting deprivation of process— that which is normally provided under regular condemnation proceedings—should not occur unless warranted by extreme circumstances. Such extreme circumstances can arise when there is an immediate threat to the public health, safety, and welfare, *Free State*, 279 Md. at 552, 369 A.2d at 1031, or possibly in extreme cases of "hold-outs," *Segall*, 273 Md. at 648, 331 A.2d at 298–99. Whenever immediate possession is sought, given the minimal time frame envisioned for proceeding under § 21–16, discovery appropriate to the case should occur, even if the normal discovery time frames are shortened by order of the court based on a party's motion.

The situation extant from the case *sub judice* exemplifies the problems with the City's utilization of § 21–16 quick-take condemnation when the acquisition of property via regular condemnation proceedings would seem as appropriate. As we stated in *Valsamaki:*

"Under the circumstances of this case, the *factually unjustified exercise* of quick-take condemnation rather than

---

**18.** Just because a "quick-take" action is easier to litigate by the City, by it not having to answer discovery, conduct and respond to depositions, etc., does not mean that it is constitutionally appropriate.

regular condemnation is an improper procedural abridgment of these [personal private property] rights. Quick-take condemnation should only be conducted when the need for the possession of the property is immediate (i.e., at the time of filing the petition, immediately necessary) and in the public interest. Otherwise, the City should utilize the regular condemnation power which permits a property owner the full exercise of his or her procedural due process rights. Under circumstances where there is no immediacy, the use of quick-take condemnation deprives a property owner of a significant part of the process to which he or she is due, without any corresponding necessity on the part of the City to justify that deprivation. When the stockpiling of property is the goal, except perhaps under some circumstances relating to a final acquisition, the regular condemnation power is more appropriate, in that it affords greater procedural due process protections to the property owner. Nor is the use of quick-take proper purely in order to gain a litigation advantage."

397 Md. at 259–60, 916 A.2d at 346.

It is evident that the City could have utilized regular condemnation proceedings and avoided this morass of procedural due process concerns. The City first initiated the urban renewal plan with regard to the Charles North Project area in 1982, upon its enacting of Ordinance No. 82–799. Then, in June 2004, when it enacted Ordinance No. 04–695, it specifically authorized the acquisition of the subject Properties. The City did not file for condemnation, regular or quick-take, until December 2005, almost a year and a half later. This gives rise to the appearance that quick-take condemnation is being used by the City to obtain a litigation advantage over property owners. Quick-take condemnation may not be used solely as a litigation tactic in the urban renewal redevelopment process. At oral argument the City contended that was not the case, that good-faith negotiations for the Properties took place prior to the quick-take proceeding. Regular condemnation proceedings, however, as we have indicated, could have been initiated

while negotiations continued, thereby providing the property owner with full procedural due process protections. If a price was reached via negotiation, the condemnation proceedings could then have been abandoned. Md. Rule 12–211; Md.Code (1974, 2003 Repl.Vol.), § 12–109 of the Real Property Article.

### V. Conclusion

In conclusion, we hold that § 21–16 of the Public Local Laws of Baltimore City requires that, in order to utilize quick-take condemnation, the City demonstrate why, because of some exigency or emergency, it is in the public interest for the City to take immediate possession of a particular property. Without such a showing, the City may not maintain a quick-take condemnation action. Therefore, we vacate the decision of the Circuit Court for Baltimore City as to the granting of the City's petition for immediate possession and remand this case to that court for proceedings consistent with *Valsamaki* and our decision in this case. Again, we reiterate, that at the time of the hearing in this case, the Circuit Court did not have our decision in *Valsamaki* as guidance in making its ruling.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTI-MORE CITY VACATED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPEL-LEE.*