Makowski v. Mayor and City Council of Baltimore, No. 81, Sept. Term 2013, Opinion by Battaglia, J.

**PROPERTY – CONDEMNATION – "QUICK-TAKE" CONDEMNATION – IMMEDIATE NECESSITY – "HOLD-OUT"**

Pursuant to Section 21-16 of the Code of Public Local Laws of Baltimore City, the City may condemn property via "quick-take" proceedings to address a "hold-out" situation, wherein the City seeks to acquire multiple properties for a single project and one or more property owners are unyielding, wanting to be the last owner of a parcel or among the last, in order to be able to demand higher prices for their property because they are holding up a large project.

**EVIDENCE – AUTHENTICATION – AUTHENTICATION BY WITNESS TESTIMONY**

Trial court did not err in excluding map purporting to show areas of Baltimore City designated as historic when the only attempt to authenticate the document was through a witness who testified he was not familiar with the document.

**CIVIL PROCEDURE – APPEALS – SCOPE OF APPELLATE REVIEW – ISSUES RAISED AFTER NOTICE OF APPEAL IS FILED**

Ordinarily, an appellate court will not consider issues decided by the trial court after a notice of appeal is filed.

**CIVIL PROCEDURE – APPEALS – SCOPE OF APPELLATE REVIEW - PRESERVATION OF ISSUES – ADEQUACY OF DISCOVERY RESPONSES**

A party who fails to file a motion to compel discovery pursuant to Rule 2-432 may not challenge, on appeal, the adequacy of the responses it received to its discovery requests.

Circuit Court for Baltimore City
Civil No. 24-C-12-002245
Argued: April 29, 2014

IN THE COURT OF APPEALS OF
MARYLAND

No. 81

September Term, 2013

EDWARD J. MAKOWSKI

v.

MAYOR AND CITY COUNCIL OF
BALTIMORE

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
McAuliffe, John F.
        (Retired, Specially
        Assigned),
                JJ.

Opinion by Battaglia, J.

Filed: June 24, 2014

This case involves a "quick-take" condemnation[1] of a property located at 900-902

---

[1] In *Mayor and City Council of Baltimore City v. Valsamaki*, 397 Md. 222, 226 n.1, 916 A.2d 324, 326 n.1 (2007), we described a "quick-take" condemnation:

> A quick-take condemnation involves "[t]he immediate taking of possession of private property for public use, whereby the estimated compensation is deposited in court or paid to the condemnee until the actual amount of compensation can be established." *Black's Law Dictionary* 310 (8th ed.2004). *See Bern-Shaw Ltd. P'ship v. Mayor and City Council of Baltimore,* 377 Md. 277, 281 n. 1, 833 A.2d 502, 504 n. 1 (2003); *King v. State Roads Comm'n,* 298 Md. 80, 85-86, 467 A.2d 1032, 1035 (1983) (Quick-take condemnation occurs where "the condemning authority takes possession of the property prior to trial upon payment into court of its estimate of the value of the property taken.").

(alterations in original).   Pursuant to Section 21-16 of the Code of Public Local Laws of Baltimore City (2012), the parties involved in a quick-take proceeding have a direct right of appeal to this Court.   Section 21-16 provides in relevant part:

> In cases where the City files a Petition for Immediate Taking of title and possession to the said property in fee simple absolute or such lesser estate or interest as is specified in the Petition, title thereto shall irrevocably vest in the Mayor and City Council of Baltimore ten days after personal service of the Petition upon each and every Defendant or, if the Defendants or any of them shall file an answer to the Petition within the said ten day period alleging that the City does not have the right or power to condemn title to the property, then on the date of the trial court's decision or on the date of decision in any appeal from the trial court.
> In the event the Defendants or any of them should file an answer, the court shall schedule a hearing within fifteen days of the date of the filing of an answer, which hearing shall be only for the purpose of contesting the right or power of the City to condemn title to the property. The trial court shall render its decision within fifteen days from the final day of said hearing. *The City or the Defendants or any of them shall have an immediate right of appeal to the Court of Appeals of Maryland from the decision of the trial court.*

N. Chester Street, comprised of a building that had formerly housed a church and contained various offices.   The Appellant, Edward Makowski, raises ten issues for our review, [2]

---

(emphasis added); *see also* Maryland Rule 8–301(a) ("Appellate review by the Court of Appeals may be obtained only: (1) by direct appeal or application for leave to appeal, where allowed by law . . . .").

[2] Mr. Makowski presents the following questions for our review:

1. Would it be useful to provide some guidance to the courts below as to what constitutes a "hold out"?
2. Should the trial court have considered or allowed consideration of whether development in accordance with the urban renewal ordinance could have occurred without acquiring the subject property?
3. What burden of proof should be required of the Petitioner when taking property via quick take? Preponderance of the Evidence?, Clear and Convincing Evidence?, Undisputed Evidence?, or readily apparent and irrefutable evidence?
4. Did Appellee prove an immediate need for the property, when the testimony was contradicted by the only witness, who stated his information was based solely on what he reads in the newspaper and who conceded that the time frame he asserted in his affidavit may not be correct?
5. Whether the appellee acted in good faith in the valuing of the property, when it was aware that smaller commercial properties in the immediate vicinity were sold for more than double the amount the appellee was offering for the subject property?
6. Can a Defendant be labeled a hold out for the purpose of a quick take when the Condemning authority has not negotiated in good faith or made good faith offers of Fair Market Value and when there is no clear immediate need to obtain the property because other property in the same acquisition area had not been acquired on the date of filing for Quick Take?
7. Were the eleventh hour cursory, superficial evasive and incomplete discovery responses provided by the Appellee sufficient to provide defendant with information that could be used in defending the condemnation case or in preparation to defend the quick take action?
8. Can an assertion, without supporting authority, that discovery has been provided form a sufficient basis for Plaintiff/Appellee to disregard subpoenas or to instruct City employees to disregard subpoenas?

2

some of which are not properly before us, and the rest of which can be addressed as a single question:

> Did the Circuit Court for Baltimore City err in granting the City's "Petition for Immediate Possession and Title" to 900-902 N. Chester Street?

We shall answer no, affirm, and explain.

We derive the following facts from the memorandum opinion issued by Judge Audrey J.S. Carrion of the Circuit Court for Baltimore City: beginning in the 1950s, Baltimore City, and particularly, the East Baltimore neighborhood, began losing manufacturing jobs. The City continued to hemorrhage jobs through the 1990s, causing significant urban decay marked by high crime, high unemployment, population loss, and a general deterioration in the Middle East neighborhood.[3] Consequently, property values

---

9. Did the court below continue to have jurisdiction under Md. Rule 2-404 with regard to subpoenaed information after the appeal was filed. ?
10. Was the opinion of the court below, which was based on belief that the facts of this case were identical to facts in "Segall" contrary to the evidence?

The City, in its Brief, has consolidated Mr. Makowski's ten questions into a single issue, phrased as follows:

> Should the Circuit Court of Baltimore City's Order of Possession and Title to 900-902 N. Chester Street be sustained?

[3] According to Baltimore City Ordinance Number 11-453, which authorized the revitalization efforts leading to the condemnation in this case, the "Middle East" neighborhood of Baltimore City targeted for redevelopment is identified specifically, by:

> Beginning for the same at the intersection of the north side of Gay Street with the north side of Biddle Street; thence binding on the north side of Biddle Street easterly to intersect the east side of Patterson Park Avenue; thence binding on the east side of Patterson Park Avenue southerly to intersect the

3

were in steep decline and the neighborhood became a proverbial ghost town. In an early attempt to combat these problems, the City attempted "piecemeal" revitalization efforts, involving the rehabilitation of individual buildings one by one. The piecemeal efforts,

division line between Lots 48 and 49, Ward 7, Section 2, Block 1623; thence binding on the division line between said Lots 48 and 49 easterly to intersect the west side of the first 10-foot alley; thence binding on said alley notherly to intersect the division line between Lots 42 and 43, Ward 7, Section 2, Block 1623; thence binding on the division line between said Lots 42 and 43 easterly to intersect the north side of the second 10-foot alley; thence binding on the north side of said alley easterly to intersect the east side of N. Bradford Street; thence binding on the east side of N. Bradford Street southerly to intersect the north side of the third 10-foot alley; thence binding on the north side of said alley easterly to intersect the west side of Milton Avenue; thence binding on the west side of Milton Avenue southerly to intersect the south side of a 6'-9" alley south of East Monument Street; thence binding on the south side of said alley westerly to intersect the west side of a 4'-4" alley; thence binding on the west side of said alley northerly to intersect the south side of a 10-foot alley; thence binding on the south side of said alley westerly to intersect the west side of N. Port Street; thence binding on the west side of N. Port Street northerly to intersect the south side of a 3-foot alley; thence binding on the south side of said alley westerly to intersect the east side of N. Montford Ave; thence binding on the east side of N. Montford Avenue southerly to intersect the south side of Fayette Street; thence binding on the south side of Fayette Street westerly to intersect the west side of Collington Avenue; thence binding on the west side of Collington Avenue northerly to intersect the north side of Orleans Street; thence binding on the north side of Orleans Street westerly to intersect the east side of Wolfe Street; thence binding on the east side of Wolfe Street northerly to intersect the north side of Jefferson Street; thence binding on the north side of Jefferson Street easterly to intersect the west side of Washington Street; thence binding on the west side of Washington Street northerly to intersect the north side of Monument Street; thence binding on the north side of Monument Street easterly to intersect the west side of Castle Street; thence binding on the west side of Castle Street northerly to intersect the south side of Madison Street; thence binding on the south side of Madison Street westerly to intersect the east side of Broadway; thence binding on the East side of Broadway northerly to the point of beginning.

4

however, had proven to be futile,[4] and the continued struggle with urban decay was readily apparent; Judge Carrion described the neighborhood as depicted in various photographs that had been admitted into evidence as a "scene more akin to the deserted, urban setting of a post-disaster film than a thriving, livable community."

The City, then, turned to more comprehensive redevelopment and revitalization efforts, including a "non-profit partnership between government, philanthropists, institutions, and the community"[5] to undertake a massive revitalization of property in the East Baltimore community, called the Eastern Baltimore Development Initiative ("EBDI"). EBDI was intended to "address, for the first time, on a comprehensive basis the blight and disinvestment in the neighborhood" through the redevelopment of an area

---

[4] Judge Carrion described an example of the failed piecemeal revitalization efforts:

> For example, the Historic East Baltimore Community Action Coalition (HEBCAC) program previously made efforts to "arrest the decay [in East Baltimore] through heterogeneous, and ultimately desultory, rehabilitation of existing structures." . . . Sadly, once one building was rehabilitated and transformed into a functioning, presentable property, nearby properties frequently became vacant, encouraging further decline. With dim prospects for financial success, private investors had little to no incentive to put money into businesses, residences, institutions, or other amenities in Middle East, or much of East Baltimore in general.

[5] According to the Eastern Baltimore Development Initiative's website, EBDI is "supported by public and private partners, including the U.S. Government, the State of Maryland, the City of Baltimore, the Annie E. Casey Foundation, Johns Hopkins Institutions, The Harry and Jeanette Weinberg Foundation, the Atlantic Philanthropies and others." East Baltimore Development Inc., *Financial Information*, http://www.ebdi.org/financial_information (last visited June 23, 2014).

encompassing 88 acres in proximity to the Johns Hopkins University Medical Campus[6]; specifically, it would involve the construction of "biotechnology, research, and life sciences buildings, a new community school . . . senior housing . . . , mixed income residential homes and rental units, commercial and retail property, green/open spaces, a new park, and fresh food stores." To acquire the properties necessary for the EBDI project, the City was authorized, pursuant to the Baltimore City Ordinance No. 11-453 entitled the "Middle East Urban Renewal Plan", to acquire, via voluntary conveyance or condemnation, properties in the project area.[7]

Mr. Makowski's property, 900-902 N. Chester Street ("the Property"), located on Block 1587[8] at the intersection of Chester Street and Ashland Avenue, lies within the heart of EBDI's planned development.[9] The Property is located within the footprint of a planned biotechnology and life sciences facility in the EBDI project, which will "'house laboratories and offices, . . . employ hundreds of scientists and support personnel, and . . .

---

[6] The area, specifically, stretches "from N. Patterson Park Avenue in the east, to S. Broadway in the west, to E. Madison Street in the south, and is bounded on the north by the Penn Central (AMTRAK/MARC) Railroad line, which curves diagonally in a southeasterly direction."

[7] The Middle East Urban Renewal Plan was originally enacted in 1979 under Baltimore City Ordinance No. 79-1202. The ordinance was most recently amended by Ordinance No. 11-453 in 2011 to, *inter alia*, reauthorize the City to acquire properties within the project area, including Mr. Makowski's property, until December 31, 2014.

[8] The Block number refers to the designation provided by the Maryland Department of Assessments and Taxation.

[9] The Property, specifically, is located in Ward 07, Section 03, Block 1587, Lot 081.

provide a range of public health services" and will be developed by the Forest City Science and Technology Group.[10] Due east of the Property, or directly across the street, is a site where EBDI is currently constructing a new school.[11]

The City attempted initially to acquire the Property in April of 2011, when it sent Mr. Makowski a "Notice of Interest to Acquire." Approximately nine months later, the City provided Mr. Makowski with an "Offer of Just Compensation." After receiving the City's offer, Mr. Makowski's then-tenant, The Answer Inc., moved out of the building; to compensate Mr. Makowski for any loss he suffered as a result of the lost rent, EBDI and the City offered to give Mr. Makowski $2,000 monthly, in exchange for which Mr. Makowski would provide the City a "Right-of-Entry", permitting the City's agents to enter

---

[10] According to EBDI's website:

> For over 20 years, Forest City Science + Technology Group has successfully delivered real estate solutions for science.
>
> Forest City Science + Technology Group is recognized as one of the country's leading developers & owners of life science campuses working with the nation's leading universities, corporations and research institutions. Forest City's research parks bring the worlds of technology & real estate together serving as a catalyst through which scientific commercialization can grow & thrive.

East Baltimore Development Inc., *Forest City*, http://www.ebdi.org/ about_forest_city (last visited June 23, 2014).

[11] Because the new school was under construction at the time the Petition for Condemnation was filed, the record is unclear as to what had existed on the property before.

the property for purposes of boarding up the building in preparation for demolition.[12] Mr.

Makowski accepted the offer and executed a rental agreement and a Right-of-Entry

agreement, both of which contemplated that the City would ultimately acquire the Property

in terms such as that contained in the rental agreement that stated:

> EBDI offers to fairly compensate you for the loss of rental income that you will experience for 900-902 N. Chester Street. This will be accomplished by paying **The Answer Inc.'s** rent obligation of <u>$2,000.00</u> per month to you beginning **April 1, 2012** and continue until the City's Condemnation Action with you is resolved.

(emphasis in original). The Right-of-Entry agreement, likewise, stated:

> WHEREAS, It is the City's Intention to acquire title to the Property at the earliest possible time as part of the Urban Renewal Plan provided for under Ordinance No. 1202.

At the time the Circuit Court issued its decision, Mr. Makowski continued to be

compensated at a rate of $2,000 per month.

While the rental agreement was in force and after the City was "unable to negotiate

with and/or agree with" Mr. Makowski "upon a price to be paid for" the Property, the City,

in April of 2012, filed a Petition for Condemnation in the Circuit Court pursuant to

Baltimore City Ordinance Nos. 1202 and 11-453, which stated in pertinent part:

> 2. It is necessary for the Petitioner to acquire the Fee Simple interest in and to the property known as 900-902 N. CHESTER STREET in Baltimore City, State of Maryland (hereinafter called the "property"), Ward 07, Section 03, Block 1587, Lot 081, and more particularly described and attached hereto in Schedule A, together with improvements thereupon, and

---

[12] The agreement also required Mr. Makowski to release his tenant, The Answer Inc., from any existing obligation under the lease agreement.

8

all the rights, ways, waters, easements, privileges, advantages and appurtenances thereto belonging or in anywise appertaining. The two properties 900 N. Chester Street and 902 N. Chester Street, having been consolidated on the tax sale records are now known on the City tax rolls as the single unit, 900-902 N. Chester Street.

3.This property will be used for redevelopment purposes; namely it is one of the properties in the East Baltimore Development Initiative, Phase II.

Mr. Makowski challenged the City's authority to condemn the property, in his response to the Petition, contending, *inter alia*, that the City had failed to demonstrate why the acquisition of the Property was necessary, because, he asserted, the City failed to allege what it intended to do with the Property. Mr. Makowski also later filed a Motion to Dismiss Petition for Condemnation, stating in its entirety:

> The Petition as filed by Mayor and City Council fails to allege facts sufficient to support the Petition.
> The Petition fails to state sufficient specific facts to support it.
> That as filed the Petition does not satisfy the requirements of the U.S. Constitution and Amendments thereto. [sic] to justify the taking of private property.

After holding a hearing on the motion, the Circuit Court denied the Motion to Dismiss Petition for Condemnation; the condemnation case was then scheduled for trial.

Prior to trial, Mr. Makowski became the sole owner on Block 1587 who had not yet conveyed or agreed to convey his property on Block 1587 to the City. The City filed a "Petition for Immediate Possession and Title", pursuant to Section 21-16 of the Code of Public Local Laws of Baltimore City (2012)[13] ("the quick-take action"), which alleged

---

[13] Section 21-16 of the Code of Public Local Laws of Baltimore City (2012) provides, in relevant part:

that immediate possession of the subject property was necessary:[14]

     1. That previously hereto your Petitioner filed a Petition for Condemnation as against the fee simple interests in that lot of ground and premises known as 900-902 N. Chester Street in Baltimore, Maryland.

     2. That it is necessary for Petitioner to acquire immediate possession and title to the said property interest as appears from the affidavit of William N. Burgee, Director of the Office of Property Acquisition and Relocation, Department of Housing and Community Development, attached hereto and prayed to be taken as a part hereof.

---

(a) *Petition for Immediate Taking.*
     Whenever any proceedings are instituted under Title 12 of the Real Property Article of Public General Laws of the State of Maryland by the Mayor and City Council of Baltimore for the acquisition of any property for any public purpose whatsoever, the Mayor and City Council of Baltimore, simultaneously with the filing of said proceedings or at any time thereafter, may file a Petition under oath stating that it is necessary for the City to have immediate possession of, or immediate title to and possession of, said property, and the reasons therefore.

     The City shall also set forth in said Petition for Immediate Taking of possession or immediate taking of title the amount it estimates to be the fair value of the said property and/or title to be acquired, and of the respective interest of each of the owners thereof if more than one, which shall be substantiated by the affidavits of two qualified appraisers, attached to said Petition. The City shall deposit into Court simultaneously with the filing of said Petition the amount of said estimate of the fair value of the property to be acquired.

[14] Pursuant to Section 21-16 of the Code of Public Local Laws of Baltimore City (2012), "[t]he City shall also set forth in said Petition for Immediate Taking of possession or immediate taking of title the amount it estimates to be the fair value of the said property and/or title to be acquired" and "deposit into Court simultaneously with the filing of said Petition the amount of said estimate of the fair value of the property to be acquired."  The City estimated the fair market value of the property to be $92,000 and deposited that amount into the Court.

3. That the necessity for the taking of such immediate possession of and title to said property is not due to any substantial fault or neglect on the part of the Petitioner.

Mr. William Burgee, Director of the Office of Property Acquisition and Relocation, did file an affidavit in which he asserted that immediate possession of the Property was necessary because the City had effectively acquired title to all other properties on Block 1587. He also stated that there was a school scheduled to open in August of 2013 to the east of the Property, prior to which all demolition on Block 1587, including that of the Property, needed to be completed to "safeguard" the health and safety of the children, guests, and staff of the school:

4. There is an immediate necessity for the Mayor and City Council to acquire title to the subject property because it is the lone hold-out among nearly 150 individual properties in Block 1587, which is bounded on the north by Eager Street, on the east by Chester Street, on the south by Ashland Avenue and on the west by Washington Street. The City plans to close Castle Street in this block and all interior alleys in furtherance of the development plan. The City has effectively acquired title to all other properties in the block, and demolition must proceed as soon as possible. To the east of the subject property, on Block 1588, lies the footprint of a new school, currently under construction, and to be opened to students in August, 2013. All demolition in Block 1587 must be completed before the school opens, in order to safeguard the health and safety of the children, faculty and staff of the new school. All structures in Block 1587 are currently vacant. The vast majority of them are abandoned, dilapidated boarded structures. The existence of such structures opposite a new community school for children as young as five is untenable. These buildings, with their attendant risk of vagrancy, vermin, disease and criminal activity, cannot be allowed to menace the school children's health and well-being. Such buildings are also fire hazards and structural time-bombs, and as such represent a serious and growing menace to the public health, safety and welfare.

Likewise, the demolition cannot occur after the school has opened because of the noise, odor, rat displacement and toxic dust that such demolition will generate.

11

Mr. Makowski filed a "Response to Petition for Immediate Possession and Title", contesting the City's right to obtain immediate possession of the Property, asserting, once again, that the City had failed to demonstrate why acquisition of the Property was necessary. Mr. Makowski also challenged the City's contention that there was an immediate need to condemn the property, attaching his own affidavit in which he asserted, *inter alia*, that the Property was not the only property that the City had not acquired on Block 1587:

> A check of the location on corner of Chester St and Ashland Ave. immediately across the street from 900-902 N. Chester St., revealed a massive incomplete construction site.
>
> The internet information about the school states that the main entrance is on Chase St., and the school has a Wolfe St. address.
>
> Paragraph 4 of William N. Burgee's Affidavit incorrectly states that 900-902 is the sole "hold out" in block 1587 and that the City has "effectively" acquired title to all other properties in the block. It further mistakenly states that all structures are currently vacant.
>
> On Sunday, June 9, 2013, I went to the area check progress of the construction site and noted that 2030 Ashland Ave., which is within block 1587 was occupied and still functioning as a church. Services were being held at the time I was there.
>
> I was informed by one of the Pastors of the Church that they had not yet found a new location and they seemed to be unaware of any pending demolition of the block.
>
> The Burgee Affidavit also states that the existence of abandoned, dilapidated boarded structures cannot continue opposite a new community school. However properties on Ashland Ave. across the school and streets intersecting Ashland Ave across from school also fit that description and no efforts to demolish any of those [] buildings is apparent as of this time. Likewise the odd side of the 2000 blk of Ashland Ave., and the even side of the 800 Blk of N. Chester St which are all in view and close proximity to the school [] do not appear to be in any stage of demolition or preparation for demolition.

Mr. Makowski later filed a "Defendant's Points and Authorities in Opposition to Plaintiff's Petition for Immediate Possession", in which he also asserted, because the City intended to convey title to his property to Forest City Enterprises, a private entity, as part of the EBDI development, that the City was taking private property "to be transferred to another party", which, he alleged did not serve a public purpose, thereby violating the strictures of the Fifth Amendment to the United States Constitution.[15] He also argued, pursuant to our decision in *Mayor and City Council of Baltimore City v. Valsamaki*, 397 Md. 222, 916 A.2d 324 (2007), that the City had failed to meet its burden of proving an immediate need for the Property.

Judge Carrion held a hearing on the City's right to take the Property. Mr. Burgee was the City's only witness, testifying, consistent with his affidavit, that the City had an immediate need for the Property, because the structures on Block 1587 had to be demolished prior to the opening of the school in August "to mitigate the possible effects of dust and other elements that would result from having to do the demolition if the school

---

[15] The Fifth Amendment to the United States Constitution provides:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; **nor shall private property be taken for public use, without just compensation.**

U.S. Const. Amend. V (emphasis added).

13

were, in fact, in session." He also testified that there were only two properties that had not yet been acquired on Block 1587 within two weeks of the hearing—the Property and a church located at 2028-2030 Ashland Avenue, which the City had acquired in the intervening period of time between filing of the quick-take petition and the hearing date:

> [MR. BURGEE]: Acquisition-wise specifically until two weeks ago there were two properties that are not owned, one of which is improved and is necessary to have been acquired and was, in fact, acquired two weeks ago. . . . That was the church. That's in addition, of course, to the subject property.
>
> * * *
>
> [COUNSEL FOR THE CITY]: Okay, but in the City's, as it were, quiver of properties to be assembled for this project are there anymore, save the subject we're here for today, to be acquired?
>
> * * *
>
> [MR. BURGEE]: No.

Mr. Burgee then explained on cross-examination that, at the time the City filed its quick-take petition, the owners of the church at 2028-2030 Ashland Avenue had agreed to convey their property to the City, but title insurance issues delayed its formal conveyance:

> [MR. MAKOWSKI]: And at the time when you filed your affidavit saying you had acquired all the other parties in block 1587, that was not correct, was it?
> [MR. BURGEE]: The affidavit was in support of the acquisition of this property in which we had under contract and established equitable interest.
> * * *
> [MR. MAKOWSKI]: Within [Block 1587], is the property 2028-2030. Ashland Avenue located?
> [MR. BURGEE]: Yes.
> [MR. MAKOWSKI]: Is it still occupied to this date?
> [MR. BURGEE]: Yes.
> [MR. MAKOWSKI]: So when you say that you had acquired all - - that I was the lone holdout; that was not correct?
> [MR. BURGEE]: We had acquired it.

14

[MR. MAKOWSKI]: But you didn't have it at the time you filed the - -
[MR. BURGEE]: We had an auction contract, which the title insurance company said was insufficient to go forward. . . . A defect in the title at the level of underwriting the title to go to settlement emerged and the title insurance company requested to have the vestry of the church or the appropriate body that governs the business decisions of the church to meet and to perform what they needed to do to satisfy a title insurance company. They did that and it went to settlement.

After Mr. Burgee concluded his testimony, Mr. Makowski testified on his own behalf and offered into evidence photographs of the school construction site, purporting to show that construction would not be completed by the August 2013 date. Mr. Makowski, additionally, sought to offer into evidence a map that he proffered would show that the Property was located within a historical district[16] and that the planned development plan would, therefore, be in contravention of the Urban Renewal Ordinance ("Ordinance"), which he testified, "speaks of the historic character of the properties and maintaining the historic character of the properties." [17] Counsel for the City objected, however, asserting that the map was not admissible because it had not been authenticated; Judge Carrion

---

[16] A Baltimore City Historic District is "an area in Baltimore City wherein, there are located buildings and structures which have demonstrated special architectural, historical, cultural, economic, social, or community significance. This program is overseen by the Commission for Historical and Architectural Preservation." City of Baltimore, *Historical and Architectural Preservation*, http://www.baltimorecity.gov/Government/Boardsand Commissions/HistoricalArchitecturalPreservation/HistoricDistricts.aspx (last visited June 23, 2014).

[17] The Ordinance makes a number of references to preserving the historic character of the East Baltimore neighborhood. For example, the Ordinance provides, with respect to rehabilitation, that "[c]leaning of masonry facades by means of sandblasting shall not be permitted, except where sandblasting is determined by the Commissioner of the Department of Housing and Community Development . . . not [to] cause damage to historic building materials."

sustained the objection.

Judge Carrion, thereafter, issued a memorandum opinion and order, in which she ordered that the City "be vested with possession of and title in the fee simple interest in that property known as 900-902 N. Chester Street, Baltimore, Maryland . . . together with the buildings thereupon, and the rights, alleys, ways, waters, privileges, appurtenances, and advantages thereupon . . . ." She found, with respect to the City's authority to take the property, that:

> [A] long-standing Urban Renew Plan for the Middle East neighborhood expressly permits the acquisition of properties within the project area, "by purchase or by condemnation either for clearance and redevelopment, for rehabilitation, or for public facilities." . . . Appendix D of the Urban Renewal Plan for the Middle East neighborhood lists the subject property as one of the properties "being acquired and disposed of for rehabilitation or redevelopment." . . . The purpose of the massive EBDI project at issue is the redevelopment and renewal, through a master plan years in the making and a colossal influx of investment, of an East Baltimore neighborhood that has suffered from urban decay for decades. By endeavoring to improve Middle East and dramatically reduce blight through a massive redevelopment and revitalization project of an 88-acre sector, Baltimore City is condemning the subject property for a public purpose.

She opined, then, that, "[t]he Court of Appeals has long held that municipalities possess power under the Maryland Constitution to condemn property for redevelopment purposes", and concluded, therefore, that "there is no question that Plaintiff has the lawful power to condemn the subject property."

With respect to the "quick-take", Judge Carrion credited the City's evidence that Mr. Makowski was the lone "hold-out", thereby inhibiting further development of the EBDI project:

16

Currently, the subject property is the only hold-out – in other words, the only property out of nearly 150 individual properties found in Block 1587 to which Baltimore City had not acquired title. . . . Demolition and the corresponding redevelopment/renewal for the EBDI project's Phase II on Block 1587 and the surrounding area cannot proceed until the City consolidates title to all properties located there, including the subject property.

Applying our decisions in *Valsamaki*, 397 Md. 222, 916 A.2d 324 and *Sapero v. Mayor and City Council of Baltimore*, 398 Md. 317, 920 A.2d 1061 (2007), she concluded that the City had met the "high threshold for situations to qualify as 'necessary' for Baltimore City to have 'immediate' possession and/or title to real property", because Mr. Makowski was a "hold-out":

> A hold out occurs where, "[d]uring property assemblages, whether private or public, one or more property owners resist selling, wanting to be the last owner of a parcel or among the last, in order to be able to demand higher prices for their property because they are holding up a larger project." *Valsamaki*, 397 Md. at 257 n.18. To counter such action, the Court of Appeals explained, "[i]n public acquisitions, the condemnation process – even quick-take actions – are available."
>
> * * *
>
> In the case at bar, this Court is presented with facts identical to those in *Segall*. The hold-out occurring here, to be sure, is a perfect example of the circumstances *Valsamaki* and *Sapero* highlighted as potentially offering sufficient immediacy and necessity to validate the use of quick-take condemnation.

Because Judge Carrion concluded that Mr. Makowski being a "hold-out" was sufficient to justify a quick-take condemnation, she expressly declined to address the City's contention that "safety concerns over the future demolition of Block 1587 occurring directly across from the new school provide[d] the necessity, immediacy, or exigency needed for a quick-take condemnation of the subject property."

17

Mr. Makowski, thereafter, filed a "Motion for Reconsideration Order Granting City's Petition for Immediate Possession and Title to Vacate, Alter or Amend Order Dated June 28, 2013", in which he challenged the Circuit Court's finding that he was the "sole hold-out":

> The hold out assertion was simply not true at the time the City filed Petition for Quick Take. The property located at 2028-2030 Ashland Ave. did not belong to the City at the time it filed for Quick Take of Defendant's property. The City at that time had not reached any agreement with owners of 2028 Ashland Ave. and that property was still actively being used after City served Defendant with Quick Take Petition.

He also asserted that the condemnation violated Constitutional principles, because the City failed to demonstrate why acquiring the Property was necessary for the development. His motion was denied.

Mr. Makowski then noted an appeal to the Court of Special Appeals from "the Circuit Court's determinations in a QUICK TAKE PROCEEDING"; because quick-take proceedings proceed directly to this Court, his appeal was transferred to this Court. We confront, then, essentially the same issue faced by Judge Carrion—whether the facts as found justify a "quick-take" condemnation action.

The State's power of eminent domain or "[t]he inherent power of a governmental entity to take privately owned property, esp[ecially] land, and convert it to public use, subject to reasonable compensation", *Valsamaki*, 397 Md. at 241, 916 A.2d at 335, quoting Black's Law Dictionary 562 (8th ed. 2004), is a power inherent in sovereign authority. *Riden v. Phila., Balt. &Wash. R.R. Co.*, 182 Md. 336, 339, 35 A.2d 99, 100

18

(1943).  It is also a power limited by the Federal and Maryland Constitutions,[18] both of which require that private property only be taken for "public use" and that the property owner receive "just compensation" for any taking.  *See Kelo v. City of New London, Connecticut,* 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005); *Prince George's County v. Collington Crossroads, Inc.,* 275 Md. 171, 188, 339 A.2d 278, 287 (1975).  The Maryland Constitution specifically authorizes condemnation actions by Baltimore City for the purposes of "comprehensive renovation or rehabilitation" and declares such use to be a "public use":

> The General Assembly of Maryland, by public local law, may authorize and empower the Mayor and City Council of Baltimore:
> (a) To acquire, within the boundary lines of Baltimore City, land and property of every kind, and any right, interest, franchise, easement or privilege therein, by purchase, lease, gift, condemnation or any other legal means, for development or redevelopment, including, but not limited to, the comprehensive renovation or rehabilitation Thereof and;
> * * *
> All land or property needed, or taken by the exercise of the power of eminent domain, by the Mayor and City Council of Baltimore for any of the aforementioned purposes or in connection with the exercise of any of the powers which may be granted to the Mayor and City Council of Baltimore pursuant to this Article is hereby declared to be needed or taken for a public use.

---

[18]  Specifically, the Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides, "No person shall . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."  U.S. Const. Amend. V.  Likewise, Article III, Section 40 of the Maryland Constitution provides, "The General Assembly shall enact no Law authorizing private property, to be taken for public use, without just compensation, as agreed upon by the parties, or awarded by a Jury, being first paid or tendered to the party entitled to such compensation."

Maryland Constitution Article XI-B, Section 1. The Maryland Constitution also authorizes certain local and state entities, including Baltimore City, to engage in "immediate" takings, under which "the General Assembly may provide that . . . property may be taken immediately upon payment therefor to the owner or owners thereof by the State or by the Mayor and City Council of Baltimore, or into court, such amount as the State or the Mayor and City Council of Baltimore, as the case may be, shall estimate to be the fair value of said property." Maryland Constitution Article III, Section 40A. When the sovereign engages in "immediate" takings or "quick-takes", "the condemning authority takes possession of the property prior to trial upon payment into court of its estimate of the value of the property taken." *King v. State Roads Comm'n of the State Highway Admin.,* 298 Md. 80, 85-86, 467 A.2d 1032, 1035 (1983). The parties litigate the issue of compensation only after the sovereign has acquired title and possession of the property.[19]

Baltimore City's quick-take authority is governed by Section 21-16 of the Code of Public Local Laws, which provides in relevant part:

> (a) *Petition for Immediate Taking.*
> Whenever any proceedings are instituted under Title 12 of the Real Property Article[20] of Public General Laws of the State of Maryland by the Mayor and City Council of Baltimore for the acquisition of any property for any public purpose whatsoever, the Mayor and City Council of Baltimore, simultaneously with the filing of said proceedings or at any time thereafter,

---

[19] Quick-take actions are distinct from traditional condemnation proceedings, in which the sovereign does not take possession of the property until *after* the issue of just compensation is fully litigated. *See* Rule 12-210.

[20] Title 12 of the Real Property Article applies to "Eminent Domain."

may file a Petition under oath stating that it is necessary for the City to have immediate possession of, or immediate title to and possession of, said property, and the reasons therefore.

The City shall also set forth in said Petition for Immediate Taking of possession or immediate taking of title the amount it estimates to be the fair value of the said property and/or title to be acquired, and of the respective interest of each of the owners thereof if more than one, which shall be substantiated by the affidavits of two qualified appraisers, attached to said Petition. The City shall deposit into Court simultaneously with the filing of said Petition the amount of said estimate of the fair value of the property to be acquired.

In *Valsamaki*, 397 Md. 222, 916 A.2d 324, we had occasion to interpret Section 21-16. The City had filed a "quick-take" petition, seeking to condemn Valsamaki's property, asserting, only, that immediate possession was necessary to "assist in business expansion." The Circuit Court, after a hearing, denied the City's petition and we affirmed. In so doing, we reasoned that, in enacting Section 21-16, the City Council had required "the City to establish under oath the immediacy of the need for quick-take condemnation", and therefore, imposed a "burden of proof on the City to establish that immediate need." *Id.* at 246, 916 A.2d at 338. We concluded, then, that to prevail in a quick-take condemnation, the City must prove that the property is being condemned for a public use and that it has an immediate need to acquire the property, which it had not done.[21]

---

[21] In *Valsamaki*, we distinguished between the City's burden in a quick-take condemnation, as opposed to a traditional condemnation:

In the case of regular condemnation, once the City establishes at least a minimal level of public use or purpose, judicial review may be thereafter limited to determining that the agency's decision is not so oppressive, arbitrary or unreasonable as to suggest bad faith; that, however, is not the case in assessing immediacy in a quick-take condemnation action in

21

Less than two months after issuing our decision in *Valsamaki*, we decided *Sapero*, 398 Md. 317, 920 A.2d 1061, in which we reversed the Circuit Court's decision to grant Baltimore City's quick-take petition after the City had, again, asserted only that acquisition of the subject property was necessary at "the earliest possible time in order to assist in business expansion." *Id.* at 327, 920 A.2d at 1066-67 (quotations omitted). We concluded that the City had failed to meet its burden of proving an immediate need for the property, emphasizing that the City must provide specific evidence of an immediate need, not merely a bald assertion that one exists. We did acknowledge, however, in both *Valsamaki* and *Sapero*, that there were cases in which the immediacy requirement had been satisfied under Section 21-16—when the subject property posed a health risk to the public, *Free State Realty Co., Inc. v. Mayor and City Council of Baltimore*, 279 Md. 550, 369 A.2d 1030 (1977), and in "hold out situations". *Segall v. Mayor and City Council of Baltimore*, 273 Md. 647, 331 A.2d 298 (1975).

A "hold-out" occurs in projects involving property assemblages, i.e., when multiple properties are assembled for a single project, where "one or more property owners resist selling, wanting to be the last owner of a parcel or among the last, in order to be able to

> Baltimore City under § 21–16. Rather, the court must also determine whether there is a necessity to justify an *immediate* taking and, in that determination, must be able to assess the reasons for the immediacy. Section 21–16 expressly *requires the City* to state reasons relating to immediacy, thus the City has the burden not only to present a *prima facie* case of public use, but, additionally, in a quick-take action, the burden to establish the necessity for an immediate taking.

*Id.* at 254, 916 A.2d at 343.

demand higher prices for their property because they are holding up a large project."

*Valsamaki*, 397 Md. at 257 n.18, 916 A.2d at 344-45 n.18. *Segall* was our seminal hold-out case, in which, in a *per curiam* opinion, we concluded that an affidavit by the City alleging "'[t]hat all other property interests in the ten disposition lot areas aforesaid ha[d] been acquired, and demolition and sale of the entire site areas [could] not be completed until possession and title of the subject property interests [were] granted to the City" was adequate to justify a quick-take under Section 21-16. *Segall*, 273 Md. at 648, 331 A.2d at 298-99 (alterations in original). In both *Valsamaki* and *Sapero* we iterated that the facts of *Segall* presented a "hold-out" situation under which a "quick-take" is warranted. *See Valsamaki*, 397 Md. at 256, 916 A.2d at 344 (noting that "[t]he City needs a more concrete, immediate necessity for an exercise of such power" and citing *Segall* as such an example); *Sapero*, 398 Md. at 347, 920 A.2d at 1079 ("These quick-take condemnations deal with the fundamental right to property, and any resulting deprivation of process—that which is normally provided under regular condemnation proceedings—should not occur unless warranted by extreme circumstances. Such extreme circumstances can arise . . . possibly in extreme cases of 'hold-outs,' *Segall,* 273 Md. at 648, 331 A.2d at 298-99.").

Hold-outs pose a significant problem in public projects; when the government seeks to address a problem such as community blight on a comprehensive basis, it, necessarily, needs to acquire multiple properties. Because of the democratic process and "the nature of public scrutiny", the need to acquire properties within a given area becomes public knowledge. Daniel B. Kelly, *The "Public Use" Requirement in Eminent Domain Law: A*

23

*Rationale Based on Secret Purchases and Private Influence*, 92 Cornell L. Rev. 1, 5 (2006). Because the public, and particularly, the owners of the properties the government seeks to acquire, have knowledge of the government's plans, the sovereign is placed at a "severe disadvantage" when it attempts to negotiate for the property's acquisition. Steve P. Calandrillo, *Eminent Domain Economics: Should "Just Compensation" Be Abolished, and Would "Takings Insurance" Work Instead?*, 64 Ohio St. L. J. 451, 468-69 (2003). The problem is exacerbated when the government acquires a significant portion of the needed properties and the remaining owners are unwilling to sell. These owners, or "hold-outs", become "monopoly suppliers of the assembled land", and thus, obtain a significant bargaining advantage, as they may seek to sell the property to the government for an inflated price, because they know about the government's need. Michael Heller & Rick Hills, *Land Assembly Districts*, 121 Harv. L. Rev. 1465, 1472-75 (2008). Accordingly, "quick-take actions . . . are available to address the situation." *Valsamaki*, 397 Md. at 257 n.18, 916 A.2d at 345 n.18; *cf. also Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*, 218 F. Supp. 2d 1203, 1231 (C.D. Cal. 2002) ("Eminent domain can even be an effective tool against free-riders who hold-out for exorbitant prices when private developers are attempting to assemble parcels for public places . . . .").[22]

---

[22] Private developers often avoid the "hold-out" problem by utilizing "buying agents" to conceal the fact that they are seeking to acquire multiple properties to avoid paying a higher price. As one commentator has explained:

> Private companies frequently deal with the potential holdout problem by creating various facades behind which they can hide. Rather than disclose

In *Segall*, Baltimore City had filed a Petition for Immediate Possession and Title, pursuant to Section 21-16, and sought to condemn Segall's property for "urban renewal purposes" as part of an urban renewal plan entitled the "Upton Project". In support of its Petition, the City had attached an affidavit of Mr. Jerome M. Katz, the City's Land Acquisition Officer of the Department of Housing and Community Development, alleging that it was necessary to acquire title and possession to ten separate lots as part of the urban renewal plan and that Segall's property was the only property to which it had not yet acquired, thereby preventing demolition:

> 1. That it is necessary for the Mayor and City Council of Baltimore to acquire title to and possession of the following listed property interests which form portions of ten separate disposition lots in accordance with the master plan for the Upton Redevelopment area.
> 2. That owner-occupants or tenants of the affected leasehold and fee simple areas will have the right to 90 days of continued occupancy under federal regulations dating from the time that possession of the subject property interests is granted to the Mayor and City Council of Baltimore.
> 3. **That all other property interests in the ten disposition lot areas aforesaid have been acquired, and demolition and sale of the entire site areas cannot be completed until possession and title of the subject property interests are granted to the City.**

(emphasis added). Segall answered, alleging that the City did not have an immediate need

---

> their large commercial construction plans and negotiate with all the landowners openly, they hire many different individuals or property management companies to approach each landowner separately. The property owners never become suspicious that a large scale project is in the works, and therefore, do not attempt to exact an artificially inflated price from the buyers.

Steve P. Calandrillo, *Eminent Domain Economics: Should "Just Compensation" Be Abolished, and Would "Takings Insurance" Work Instead?*, 64 Ohio St. L. J. 451, 469 n.78 (2003).

to acquire the property. The Circuit Court granted the Petition for Immediate Possession and Segall moved to set aside the order, which was denied; we affirmed.

As in *Segall*, the City's inability in the present case to acquire the Property prevented it from engaging in demolition in furtherance of an urban renewal plan. Indeed, Mr. Makowski's property, one of almost 150 other properties in totality, inhibited further development to a greater degree than did any one of the *Segall* properties, because his was the only property on Block 1587 that was left. Mr. Makowksi, thus, retained leverage to hold a hammer over the City in order to gain financial advantage, and accordingly, was a "hold-out" within the meaning of *Segall*.

Mr. Makowski's attempt to distinguish *Segall* is unavailing. He asserts that, unlike *Segall*, the City, in the present case, had not acquired all of the properties on Block 1587, based, primarily, on Mr. Burgee's testimony that, at the time of filing the Petition, the City had not acquired the church property.[23] Judge Carrion, however, concluded otherwise, finding that, "the subject property is the only hold-out—in other words, the only property out of nearly 150 individual properties found in Block 1587 to which Baltimore City has

---

[23] Mr. Makowski also challenges the propriety of the quick-take on the basis that the City failed to act in good faith in valuing the property, referring us to his motion for reconsideration in which he attached deeds indicating that two nearby properties had been conveyed to the City for a higher price than was offered for Mr. Makowski's property. He asserts, first, that he could not be considered a "hold-out" because the City never extended a good-faith offer for the property, and second, that the offer of compensation failed to comply with the Constitutional requirement that he be awarded "just compensation." The right-to-take hearing, however, is "only for the purpose of contesting the right or power of the City to condemn title to the property." Section 21-16(c). Issues with regard to compensation, therefore, are not before us.

not acquired title" and the evidence adduced at trial clearly supports Judge Carrion's finding. Mr. Burgee testified that, despite formal conveyance having not been completed due to title insurance issues, the owners of the church were under contract to convey 2028-2030 Ashland Avenue to the City and had indeed done so two weeks prior to the hearing. He, likewise, testified that demolition of the Property and the "whole square block" needed to occur, and that the City could not do so until acquiring the Property. Mr. Makowski relies solely on the fact that formal conveyance of the church had not been effectuated at the time the quick-take petition was filed. A "hold-out" occurs, however, when the remaining property-owners are *unwilling* to sell; because the owners of the church were *willing* to sell, as indicated by the auction contract Mr. Burgee testified the church owners had executed, Judge Carrion correctly recognized that Mr. Makowski was the sole "hold-out" on Block 1587.[24] We conclude, therefore, that the quick-take action was warranted.[25]

---

[24] Mr. Makowski also argues that Judge Carrion's finding was erroneous because of a vague reference by Mr. Burgee to an "outlier" property:

> [MR. BURGEE]: And then the other outlier, if you will, property is not as compelling to acquire because it's already been demolished and its vacant land so there is no demolition activity associated with a vacant property.

Aside from this one reference there was no evidence adduced with respect to an alleged "outlier" that inhibited development.

[25] In his Brief, Mr. Makowski raises the issue of, "[w]hat burden of proof should be required of the Petitioner when taking property via quick take proceeding?" Although Mr. Makowski does not contend that Judge Carrion applied the wrong burden, he asserts that "the burden of proof should be that the necessity for immediate taking be shown by at

We address, now, a number of other issues raised by Mr. Makowski. The first issue is an alleged evidentiary error pertaining to Judge Carrion's decision to exclude evidence regarding whether the demolition of the Property was consistent with the Urban Renewal Ordinance's references to preserving the historic character of East Baltimore. Specifically, Mr. Makowski sought to question Mr. Burgee on the stand regarding a map

---

the very least: Clear and Convincing evidence," which, he argues was not met, relying on language from *Sapero* in which we stated:

> Concerning the immediate necessity for quick-take condemnation, Mr. Sapero asserts that § 21–16 "specifically require[s] that some justifiable, readily apparent and irrefutable evidence [must] exist that a taking is necessary, not just a bald assertion that a necessary reason exists." And furthermore, that "[t]he quick-take law's plain language initially places the burden of proof upon the Petitioner requesting immediate possession, that is, [the City], to provide *reasons* for the necessity for immediate possession, not just some general assertions that a reason exists." We agree with the gist of Mr. Sapero's contentions. They are in accord with our decision in *Valsamaki,* 397 Md. 222, 916 A.2d 324.

*Sapero v. Mayor and City Council of Baltimore*, 398 Md. 317, 335-36, 920 A.2d 1061, 1072 (2007). The language quoted above from *Sapero* merely iterates that the City must offer evidence of an immediate need, rather than a bald assertion that one exists. In the instant case, as we have explained, the City provided undisputed testimony that Mr. Makowski was the only property owner on Block 1587 who had not yet agreed to convey his property to the City, thereby satisfying the dictates of *Sapero*.

Nothing from *Valsamaki* or *Sapero*, however, requires that the City bear a burden higher than what is traditionally required in civil cases—a preponderance of the evidence. *See generally Coleman v. Anne Arundel Cnty. Police Dep't*, 369 Md. 108, 134, 797 A.2d 770, 786 (2002) ("The most widely applied measure of the ultimate burden of persuasion in civil cases is by a preponderance of the evidence . . . ."). As one oft-quoted commentator on the Maryland Rules of Evidence has observed, the clear and convincing standard "is applied when a particular claim or defense is disfavored for policy reasons, or the act alleged is one of moral turpitude or that would otherwise have stigmatic impact." Lynn McLain, *Maryland Evidence State and Federal* § 300:4 (Vol. 5, 2013 Supp.), neither of which is applicable to quick-take condemnations.

that he proffered would have shown that the Property was in an area of Baltimore designated as "historic." The City objected on the grounds that Mr. Burgee testified that he did not recognize the map, and asserted, therefore, that Mr. Makowski had failed to properly authenticate it:

> [COUNSEL FOR THE CITY]: Well, Mr. Burgee first testified that he doesn't know, that he's not familiar with the document. He doesn't know what it is. Mr. Makowski has instructed him that there are certain nomenclature at the bottom of the document - - document seeming to indicate what it is but there's nothing to verify what it is. It's a one-page printed document. I'm not sure how it's pertinent or relevant or - - and certainly not authenticated.

Mr. Makowski responded that he had received the map from the City:

> [MR. MAKOWSKI]: Your Honor, I got that from the City of Baltimore in the same building that [the Assistant City Solicitor] works in on the eighth floor. I sent copies of it to [the Assistant City Solicitor]. I attached it to my response in a colored copy I attached to the response I filed to their motion for quick take.
>    So it's not that it's coming here also for the first time. It's a document that has the City of Baltimore's logo at the bottom where it was issued from.

Judge Carrion sustained the objection.

Authentication of a document is governed by Rule 5-901, which states, "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The Rule further elucidates a myriad of ways to authenticate evidence; the most pertinent to the instant matter is Rule 5-901(b)(1), which provides that evidence may be authenticated through "[t]estimony of a witness with knowledge that the

29

offered evidence is what it is claimed to be." Mr. Burgee, however, testified that he had never seen the document before nor recognized it. Accordingly, Mr. Makowski failed to authenticate the document.

Mr. Makowski argues, next, that the Circuit Court erred in denying his "Motion for Leave to Perpetuate Evidence and Motion for Order to Compel Plaintiff to Produce Documents that were Subpoenaed" pursuant to Rule 2-404,[26] as well as in granting the City's "Motion to Quash Subpoenas." These orders were issued after Mr. Makowski noted his appeal in this case and are not appropriate for our review. *See, e.g.*, *Lazenby v. Asher, Jr. & Sons*, *Inc.*, 266 Md. 679, 688, 296 A.2d 699, 704 (1972); *Silverberg v.*

---

[26] Rule 2-404 provides, in relevant part:

(b) **Pending Appeal.** After an appeal has been taken or before an appeal is taken if the appeal period has not expired, the circuit court in which the judgment or appealable order was entered may allow perpetuation of evidence for use in the event of further proceedings in that court. A motion for leave to perpetuate evidence shall be filed and served as if the action were pending in the circuit court. The motion shall identify (1) the reasons for perpetuating evidence, (2) the persons to be examined and the substance of the testimony expected from each, and (3) the documents or things to be inspected and preserved, if any. If the court finds that perpetuation of the evidence is proper to avoid a failure or delay of justice, it may enter an order allowing depositions to be taken, permitting documents and tangible things to be inspected or copied as provided by Rule 2-422, or requiring submission to a mental or physical examination as provided by Rule 2-423. The court's order may include any provision which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense. Testimony perpetuated in accordance with this section may be used to the extent permitted by Rule 2-419. Use of evidence perpetuated in accordance with this section shall be subject to the court's order permitting it to be perpetuated.

30

*Silverberg*, 148 Md. 682, 687-89,130 A. 325, 327 (1925), *disapproved of on other grounds by Lewis v. Lewis*, 219 Md. 313, 149 A.2d 403 (1959); *Baltimore Skate Mfg. Co. v. Randall*, 112 Md. 411, 414, 76 A. 491, 493 (1910).[27]

Mr. Makowski, finally, argues that the City provided him with "eleventh hour cursory, superficial evasive and incomplete discovery responses", contending, generally, that "[d]ocuments requested were not produced", the City did not "provide any specific response as to each of the document requests", and that "the [i]nterrogatory [a]nswers were deficient, evasive and non responsive". Mr. Makowski did not file a motion to compel discovery pursuant to Rule 2-432(b), which permits "[a] discovering party, upon reasonable notice to other parties and all persons affected" to "move for an order compelling discovery if", *inter alia*, "a party fails to answer an interrogatory submitted under Rule 2-421" or "a party fails to comply with a request for production or inspection under Rule 2-422," Rule 2-432(b),[28] so that the trial court did not decide the discovery

---

[27] Even were Mr. Makowski's arguments with respect to his Motion For Leave to Perpetuate properly before us, they would be unavailing, because the motion itself was insufficient. Although we have not yet had occasion to interpret Rule 2-404, Judge Glenn Harrell, then-writing for the Court of Special Appeals, has explained, "the very function of a rule permitting perpetuation of evidence is to preserve evidence that would otherwise be in danger of later becoming unavailable", and therefore, a motion to perpetuate the evidence should not be granted without a showing that "a person seeking to perpetuate testimony or other evidence pursuant to Rule 2-404 [has] set forth sufficient facts to demonstrate that the immediate taking of testimony is made necessary because there exists some actual risk that the evidence sought might be lost by delay." *Allen v. Allen*, 105 Md. App. 359, 373, 659 A.2d 411, 417 (1995) (footnoted omitted).

[28] Rule 2-432(b), provides, in its entirety, that:

issue. The issue, therefore, is not properly before us, pursuant to Rule 8-131(a), providing

that, "[o]rdinarily, the appellate court will not decide any other issue unless it plainly

appears by the record to have been raised in or decided by the trial court". Rule 8-131(a).

We have explained that the purpose of Rule 8-131 is to allow "trial courts to

explicate, to some degree, just what they are deciding or finding so that we may perform

our tasks." *Wilkerson v. State*, 420 Md. 573, 597, 24 A.3d 703, 717 (2011). Rule 8-131,

likewise, serves the "interests of fairness . . . by 'requir[ing] counsel to bring the position of

---

(b) **For Order Compelling Discovery.**
(1) When Available. A discovering party, upon reasonable notice to other parties and all persons affected, may move for an order compelling discovery if
(A) there is a failure of discovery as described in section (a) of this Rule,
(B) a deponent fails to answer a question asked in an oral or written deposition,
(C) a corporation or other entity fails to make a designation under Rule 2-412 (d),
(D) a party fails to answer an interrogatory submitted under Rule 2-421,
(E) a party fails to comply with a request for production or inspection under Rule 2-422,
(F) a party fails to supplement a response under Rule 2-401 (e), or
(G) a nonparty deponent fails to produce tangible evidence without having filed written objection under Rule 2-510 (f).
(2) Contents of Motion. A motion for an order compelling discovery shall set forth: the question, interrogatory, or request; and the answer or objection; and the reasons why discovery should be compelled. Instead of setting forth the questions and the answers or objections from a deposition, the relevant part of the transcript may be attached to the motion. The motion need not set forth the set of interrogatories or requests when no response has been served. If the court denies the motion in whole or in part, it may enter any protective order it could have entered on a motion pursuant to Rule 2-403. For purposes of this section, an evasive or incomplete answer is to be treated as a failure to answer.

32

their client to the attention of the lower court at the trial so that the trial court can pass upon, and possibly correct any errors in the proceedings.'" *Conyers v. State*, 354 Md. 132, 149, 729 A.2d 910, 918-19 (1999) (alterations in original). In this case, the trial court never had an opportunity to address the alleged omissions; we do not, therefore, address the adequacy of the City's discovery responses.

For all of the foregoing reasons, we affirm the decision of the Circuit Court.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

33